STATE OF NORTH CAROLINA v. PAUL DEWAYNE CUMMINGS

No. 1A05

(Filed 24 August 2007)

### 1. Jury— capital selection—challenge for cause—police lieutenant

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's challenge for cause of a police lieutenant during the jury selection process, because: (1) the record fairly supported the conclusion that the prospective juror could perform his duties as a juror consistent with the trial court's instructions when considering mitigating evidence; (2) the prospective juror indicated numerous times that he would follow the law as instructed by the trial judge, and it is reasonable to believe that he understood that law including the presumption of innocence; (3) neither the qualifications nor the grounds for challenging a juror for cause lead to a recognition of any type of rule prohibiting members of the law enforcement community from entering the jury pool; and (4) exchanges between defense counsel and the prospective juror about his law enforcement employment and how that might influence his determinations of credibility demonstrate that he would view each witness on the facts of the case and not automatically give the prosecution's law enforcement witnesses more weight.

### 2. Jury— capital selection—challenge for cause—automatic vote for death penalty

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's challenge for cause of a prospective juror who would allegedly vote automatically for the death penalty in every first-degree murder case, because: (1) after reviewing the totality of the prospective juror's voir dire, it cannot be said that the trial court's decision was manifestly unsupported by reason; and (2) the prospective juror who at first appeared confused and a strong proponent of the death penalty in premeditated murder cases later indicated to counsel that he would follow the law and that he would return a recommendation of life imprisonment without parole if the State failed to meet its burdens of proof and persuasion during the penalty proceeding.

**3. Jury— capital selection—voir dire—stake out questions**

The trial court did not abuse its discretion in a first-degree murder case by sustaining prosecution objections to alleged stake out questions asked by defense counsel during voir dire including asking prospective jurors what they might view as harm experienced by a child exposed to domestic violence, the effects on children who had been exposed to physical abuse, whether a prospective juror believed her grandson was harmed by fights between his parents, whether a juror believed that a woman who was abused has the ultimate responsibility to protect her children, how a particular family was affected by alcohol abuse, why a juror thought people would abuse hard drugs, and whether, in a prospective juror's personal experience, the effects of drug abuse were negative, because the trial court gave defendant wide latitude to determine whether prospective jurors had been personally involved in any of those situations, but it was within the trial court's authority to limit questioning on these matters and not permit the hypothetical and speculative questions that the trial court could have determined were being used to try defendant's mitigation evidence.

**4. Jury— capital selection—voir dire—costs of life imprisonment versus the costs of death sentence**

The trial court did not abuse its discretion in a first-degree murder case by prohibiting defense counsel from questioning prospective jurors on whether their decisions would be influenced by their ideas about the costs of life imprisonment versus the costs of a death sentence in light of *State v. Elliott*, 360 N.C. 400 (2006).

**5. Sentencing— capital—defendant's argument—denial of exhibit about presumption of life imprisonment**

The trial court did not abuse its discretion in a capital sentencing proceeding by refusing to allow defendant to present to the jury during closing argument an exhibit containing the statement that life imprisonment is the presumptive sentence for first-degree murder unless and until the prosecution proves otherwise, because defendant's admission that his assertion that life was the presumptive sentence was nothing more than defense counsel's contention of the law amounted to invited error, and thus, defendant cannot show prejudice even if the trial court's ruling was erroneous.

STATE v. CUMMINGS

[361 N.C. 438 (2007)]

**6. Sentencing— capital—prosecutor's argument—crime committed for money**

The trial court did not abuse its discretion in a capital sentencing proceeding by failing to intervene ex mero motu during the prosecution's closing argument when the prosecutor began to discuss how defendant's crime was committed for money, because: (1) it would be proper for the jury, under the facts of this case, to consider defendant's motive for pecuniary gain in the commission of the murder through the N.C.G.S. § 15A-2000(e)(5) robbery with a dangerous weapon aggravating circumstance; and (2) considering the statement in context, the record indicated that the prosecution was alluding to the fact that there were sixteen jurors in the jury box sitting on their wallets right now, and not that the jury should find sixteen pecuniary gain aggravating circumstances.

**7. Sentencing— capital—prosecutor's argument—chart—armed robbery as aggravating circumstance**

The trial court did not abuse its discretion in a capital sentencing proceeding by overruling defendant's objection when the prosecutor requested to use a chart that stated in part that the armed robbery during the premeditated murder is an aggravating factor and by allowing the prosecution to tell the jury it had already found the N.C.G.S. § 15A-2000(e)(5) aggravating factor, even though defendant did not object to those statements, because: (1) N.C.G.S. § 15A-2000(e)(5) states that the commission of robbery with a dangerous weapon during the commission of first-degree murder is an aggravating circumstance to be considered; and (2) the prosecution relayed to the jury that the State must prove the aggravators beyond a reasonable doubt, and then defense counsel, with defendant's permission, conceded to the jury that the prosecution had, indeed, proved the aggravating circumstances beyond a reasonable doubt.

**8. Sentencing— capital—prosecutor's argument—letter shown in photograph**

The trial court did not abuse its discretion in a capital sentencing proceeding by failing to intervene ex mero motu in the prosecution's closing argument when the prosecution read a letter from the victim's son that was shown in a crime scene photograph of the victim's living room but the actual letter was not in evidence, because: (1) considering the entirety of the record, the

reading of the letter by the prosecution without defendant's objection was not so grossly improper that it rendered the trial and sentence fundamentally unfair; and (2) the trial court admonished the jurors to rely solely upon their recollection of the evidence in their deliberations and stated that final arguments are not evidence.

### 9. Sentencing— capital—prosecutor's argument—compassion and mercy not the law

The trial court did not abuse its discretion in a capital sentencing proceeding by failing to intervene ex mero motu when the prosecutor stated that compassion and mercy were not the law, because our Supreme Court has stated that prosecutors may properly argue to the sentencing jury that its decision should be based not on sympathy, mercy, or whether it wants to kill defendant, but instead on the law.

### 10. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity

The trial court did not commit plain error in a capital sentencing proceeding by instructing the jury pursuant to N.C.G.S. § 15A-2000(f)(1) regarding no significant history of prior criminal activity even though defendant did not request this mitigating circumstance, because: (1) the determination is not based merely on the number of prior criminal activities, but also on the nature and age of the activities; (2) even if defendant does not request the submission of the (f)(1) mitigator or objects to its submission, the trial court must submit the circumstance when it is supported by sufficient evidence; (3) a rational juror could conclude that defendant's underage alcohol and illegal drug use were minor offenses and thus insignificant when considered in light of the total circumstances; and (4) the trial court could have reasonably believed a rational juror would find a prior robbery to be insignificant when the robbery was so close in time to the robbery and murder at issue and was an aberration in an otherwise insignificant criminal background.

### 11. Evidence— affidavit—past recollection recorded— corroboration

The affidavit of a law student concerning statements made in class by another student, who had worked on defendant's case as a summer intern, that attributed by inference statements about defendant's case by the prosecutor was not admissible as sub-

stantive evidence under N.C.G.S. § 8C-1, Rule 803(5) as past recollection recorded in a hearing on a motion for appropriate relief and was properly admitted only for the purpose of corroboration where there was no showing that the affiant had insufficient recollection to enable him to testify fully and accurately.

**12. Evidence— law professor—opinion testimony—personal perception**

The trial court did not err in a hearing on a motion for appropriate relief by allowing a law professor to testify that he believed a discussion by a law student, who interned in the prosecutor's office and worked on defendant's case, only showed that he was illustrating a race-neutral policy and was not talking about the actual decision made in defendant's case, because: (1) the professor's testimony satisfied N.C.G.S. § 8C-1, Rule 701 as his opinion on what the law student meant was based on his personal perception of the statements made; (2) the professor's opinion would be helpful in determining whether the decision to prosecute defendant capitally was based upon racial or political consideration, just as defense witnesses' testimony concerning their inferences drawn from the law student's class presentation was helpful in determining that same issue; and (3) no verbatim transcript of the class discussion existed, and thus, the opinion of those present helped the trial court determine whether the statements allegedly attributed to the prosecutor indicated a denial of defendant's constitutional rights.

**13. Sentencing— death penalty—proportionality**

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) the trial court found three aggravating circumstances to exist beyond a reasonable doubt including the N.C.G.S. § 15A-2000(e)(3) aggravator that defendant had previously been convicted of a felony involving the threat of violence to a person, the N.C.G.S. § 15A-2000(e)(5) aggravator that the murder was committed while defendant was engaged in the commission of a robbery with a dangerous weapon, and the N.C.G.S. § 15A-2000(e)(9) aggravator that the murder was especially heinous, atrocious, or cruel; (2) defendant was the sole murderer of his neighbor in her home; and (3) defendant did not seek medical attention for his victim whom he stabbed numerous times in the face, but instead left her bleeding to death on the floor of her own home after rendering her helpless while he departed to withdraw money from

her bank account by using her ATM card and the PIN number he had tortured out of her.

### 14. Appeal and Error— preservation of issues—failure to argue—failure to cite authority

Defendant's remaining assignments of error that he provided no argument or supporting authority for in his brief are deemed abandoned and are therefore dismissed under N.C. R. App. P. 28(b)(6).

Chief Justice PARKER concurring in result only.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered on 8 September 2004 and a judgment denying defendant's motion for appropriate relief dated 27 January 2005, both entered by Judge Jerry Cash Martin in Superior Court, New Hanover County, following a jury verdict finding defendant guilty of first-degree murder. On 13 April 2006, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 8 January 2007.

*Roy Cooper, Attorney General, by Amy C. Kunstling and Daniel P. O'Brien, Assistant Attorneys General, for the State.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellant.*

BRADY, Justice.

On 4 October 2002, Paul Dewayne Cummings (defendant) stabbed his neighbor Jane Head (the victim) to death with her paring knife in her own home. Defendant then stole the victim's van and automated teller machine (ATM) card and used the ATM personal identification number (PIN) he had extracted from the victim before her death to withdraw $400 from her bank account. Defendant was convicted of robbery with a dangerous weapon and first-degree murder. The jury returned a binding recommendation of death for the first-degree murder conviction, and the trial court sentenced defendant accordingly. The trial court also sentenced defendant to a term of 117 to 150 months of active imprisonment for the robbery with a dangerous weapon conviction.

**STATE v. CUMMINGS**

[361 N.C. 438 (2007)]

## FACTUAL AND PROCEDURAL BACKGROUND

Jane Head, a sixty-two-year-old woman, lived alone in a mobile home in Wilmington. Jane Head's first career was as a special education and first-grade teacher. At the time of her murder, she was a nanny and home care provider, serving both children and the elderly. Her residence was in the same mobile home park where defendant and his family resided. Approximately three months before the murder, a break-in occurred at Jane Head's residence in which the intruder stole her television. Mrs. Head told her daughter and investigators that she believed defendant was the perpetrator. Approximately a week before her murder, Mrs. Head telephoned her son's wife around 9:30 or 10:00 p.m. and confided to her in a whispered voice that defendant was banging on her door and that she was afraid.

Defendant disclosed to mental health professionals that on 4 October 2002, the day of the murder, he had been using crack cocaine and drinking beer at a picnic table near the victim's residence. When he saw the victim arrive, he approached her and asked her for a ride to the store in order to purchase more beer. According to defendant's recitation to the mental health professionals, the victim agreed to drive defendant to the store, but stated that she needed to use the restroom before leaving. Defendant then decided to rob her to garner cocaine money. Grabbing a small paring knife from her kitchen, defendant awaited his victim's return from the restroom, after which he stabbed her sixteen times in the face, head, neck, back, shoulder, and chest. While stabbing her, defendant asked the victim "Where is the money?" and when she asked him, "Why are you doing this?" he told her to "Shut up, do you have any money?" Eventually defendant obtained her ATM card, stabbed her a few more times and then demanded her PIN from her. She told him the PIN, which was composed of numbers corresponding to letters that spelled a family member's name. Defendant put the knife down to record the number on a piece of paper. He then stole the victim's van, drove it to a store to purchase cigarettes and beer, and then proceeded to the ATM, where he withdrew $400 from the victim's bank account.

The victim's daughter, Joni Head Carson, and her husband, Bill Carson, arrived at the victim's residence at approximately 4:55 p.m. on the day of the murder. They had previously spoken to the victim by telephone at 4:30 p.m. When the victim's daughter entered the residence, she found her mother lying face down on the guest bedroom

floor, with a large pool of blood around her. Mr. Carson called 911, and the couple attempted to resuscitate the victim to no avail.

Officer Kevin Getman of the Wilmington Police Department responded to the scene of the crime. An emergency medical technician told Officer Getman that a window on the adjoining mobile home appeared to have been broken. Officer Getman then entered the nearby mobile home to determine whether any other victims existed. Upon entry Officer Getman, along with Officer Weeks, discovered blood on the blinds and on clothing bundled up beside the window. The officers then obtained a search warrant for the mobile home, which happened to be defendant's residence. They found a bloody, bent knife matching the description of the victim's missing paring knife on the ground under the open window of defendant's residence. The DNA profile of the blood on the knife, the blood on the blinds, the blood on a shirt found in defendant's mobile home, and blood found in defendant's sink matched that of the victim.

The next night, 5 October 2002, police responded to a report that defendant and his father were fighting at the mobile home park. Defendant was subsequently arrested for the murder of Jane Head. At the time of his arrest, defendant's shorts were stained with blood. The DNA profile of the blood on defendant's shorts matched that of the victim. On 13 January 2003, defendant was indicted by the New Hanover County grand jury for the murder and robbery with a dangerous weapon of Jane Head.

Defendant's evidence at the guilt-innocence proceeding tended to show that his father, Paul Ransom, was a violent man, especially toward defendant and his mother. Mr. Ransom beat defendant and his mother on multiple occasions, prompting significant intervention by the Department of Social Services. Additionally, the evidence tended to show that defendant abused alcohol and illegal drugs. Psychologist James Hilkey testified as an expert in forensic psychology and drug abuse and addiction. It was his opinion that defendant was intoxicated at the time of the murder and was affected by dysthymia and post-traumatic stress disorder. Additionally, Dr. Hilkey testified that defendant met the criteria for borderline personality disorder.

After hearing this evidence and being instructed on the law, the jury deliberated and returned verdicts finding defendant guilty of first-degree murder and robbery with a dangerous weapon. Consistent with the jury's verdict of guilty of first-degree murder, the trial court moved to the sentencing proceeding of defendant's trial.

The State presented evidence at the sentencing proceeding that on 31 August 2002 defendant robbed Eula Dale Cauldwell, a fifty-two-year-old taxi driver, at knife point. The State also presented victim-impact evidence from Mrs. Head's family and friends. Defendant's evidence in mitigation tended to show that defendant was remorseful, had converted to Christianity, was a good elementary school student, that defendant lacked a father figure in his life, that defendant was a productive employee in the detention center's food service area, that defendant had a good, upbeat attitude while detained, and that when he was fourteen or fifteen he received an award from the Woodmen of the World for saving the life of another boy's father. Additionally, defendant presented further evidence of physical abuse, substance abuse, and mental instability.

After being instructed by the trial court on sentencing matters, the jury deliberated and returned a recommendation that defendant be sentenced to death. The jury found as aggravating circumstances that defendant had been previously convicted of a felony involving the threat of violence to the person, that the murder was committed while defendant was engaged in the commission of robbery with a dangerous weapon, and that the murder was especially heinous, atrocious, or cruel. The jury found as statutory mitigating circumstances that the murder was committed while defendant was under the influence of mental or emotional disturbance and that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. The jury also found ten other nonstatutory mitigating circumstances to exist. The jury did not find thirty other submitted mitigating circumstances. The trial court sentenced defendant according to the jury's recommendation.

## ANALYSIS

### I. Jury Selection

#### A. The Denial of Defendant's Challenge of Lieutenant Goodson

[1] Defendant's first argument is that the trial court erred in denying his challenge for cause of Lieutenant Billy Goodson during the jury selection process. At the time of defendant's trial, Lt. Goodson was the Carolina Beach Chief of Detectives and had investigated numerous homicide cases, including many that were prosecuted capitally. Defendant contends that the trial court's decision to deny his challenge of Lt. Goodson was an abuse of discretion because, in defendant's view, Lt. Goodson could not impartially consider evidence in defense or mitigation, would not afford defendant the presumption of

innocence or a presumption of a life sentence, and was too closely aligned with the prosecutor's office and would therefore accord more weight to police officer testimony. This Court has recently reaffirmed the method for reviewing whether a defendant's challenge for cause of a juror was proper:

> We review a trial court's ruling on a challenge for cause for abuse of discretion. *State v. Kennedy*, 320 N.C. 20, 28, 357 S.E.2d 359, 364 (1987) (citing *State v. Watson*, 281 N.C. 221, 188 S.E.2d 289, *cert. denied*, 409 U.S. 1043 (1972)). A trial court abuses its discretion if its determination is "manifestly unsupported by reason" and is "so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record. *See Wainwright v. Witt*, 469 U.S. 412, 434 (1985).

*State v. Lasiter*, 361 N.C. 299, 301-02, 643 S.E.2d 909, 911 (2007) (citations omitted). The question that the trial court must answer in determining whether to excuse a prospective juror for cause is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424 (internal quotation marks omitted).

During *voir dire* by defendant's counsel, Lt. Goodson indicated that it was his personal opinion that "mental illness is a condition that takes out the rationalization that you and I grew up with, from right and wrong. Short of that, there is not a whole lot on that list [of possible mitigating circumstances] that I would consider."[1] Lt. Goodson also stated that "[d]omestic violence, drug use, broken homes. . . . learned violence[:] I don't find those as acceptable mitigating circumstances for someone having committed a homicide." He further stated that he would "have a very limited window in which things that I would consider that would negate the death penalty." When questioned on issues of the burdens of proof and persuasion, Lt. Goodson stated that he equated the presumption of innocence as "being on the fence" and being "even-steven." When asked whether his long law enforcement career would influence his judgment in this case, he indicated that he might be inclined to give more credence to law enforcement testimony although it would depend on each case's circumstances.

---

1. Unless otherwise indicated by brackets, all transcript quotations are verbatim.

However, personal opinions aside, Lt. Goodson also said "I can follow the law, as I told the State, regardless of having the knowledge of the circumstances that's been [alluded] to by you and [defense co-counsel], I would follow the law down to the line." (Emphasis added.) Additionally, in response to defense counsel's questioning, Lt. Goodson stated, "If the Court instructs me to follow certain guide-lines, I will follow them to the end." Regarding the issue of mitigating evidence, Lt. Goodson indicated he would consider all such evidence, stating that "[i]f the Court directed me to consider it, then that's going to happen." Lt. Goodson also indicated that his view of the presumption of innocence gave defendant the "benefit of the doubt." With respect to whether he would give law enforcement testimony more credibility than statements made by defense counsel, he indicated that he might in some cases, but in this case he would not.

Based upon the answers to the questions elicited during *voir dire*, defendant challenged Lt. Goodson for cause, and the trial court denied that challenge. In doing so the trial court stated:

> All right. The Court has had occasion to observe Billy Goodson, juror at Seat 9, for some time. He's been examined by the Court, by counsel for the State and counsel for the Defendant. And there is just no doubt about it, he is a man of strong conviction and he is with [sic] viewed with strong beliefs, including matters in mitigation.

> But the Court is, likewise, convinced that he will follow the law. And if his belief or beliefs differ from the law, he will yield and try to obey and follow the law as he is instructed to him [sic] by the Court.

> In looking at his face, he's got a face that's been chiseled in stone and I imagine his convictions are just the same way. His convictions are strong. And if he sits there and tells us that he will yield a matter of personal preference or belief and follow the law, I think he will do so. The evidence demonstrates that he is a soldier. He is a patriot, a good man and good juror.

> The Court is of the view is [sic] that he should not be excused for cause and the motion to challenge for cause is denied.

Defendant then used a peremptory challenge to excuse Lt. Goodson. Later in the selection process, after defendant had exhausted his peremptory challenges, he renewed his challenge for cause of Lt. Goodson. The trial court considered the motion and stated:

All right, the Court does . . . revisit the ruling with regard to juror in Seat 9, Billy Goodson. Mr. Goodson is the gentleman identified by the Court as the soldier, patriot, good man, good juror, a man of strong convictions, views with strong beliefs, including the matters in mitigation. The Court concluded he would follow the law even if his beliefs differed. And looking back at his comments, I think any person could pull out any one comment by any one juror to probably support a position either for or against the juror being discharged.

And so the Court, likewise, has had an occasion to review his examination by the Court[,] by Counsel for the State and by Counsel for the Defendant and considered his examination in its totality and I do note that he did indicate that he could follow the law, even though he may disagree with it. He was being asked at that time about self-imposed alcoholism, which again is just one comment by the juror, but the total of his comments and the examination of this Court of his demeanor and his responses and his approach to his view convinces this Court that the ruling should stand. Billy Goodson should not be excused for cause upon the renewed motion. The motion to remove him for cause is denied.

Defendant's argument that the trial court erred because Lt. Goodson would not consider mitigating evidence is without merit. While there is no constitutional requirement of a certain method in which mitigating circumstances are considered by jurors, a juror must be able to consider all relevant mitigating evidence. *Kansas v. Marsh,* —— U.S. ——, 126 S. Ct. 2516, 2523, 165 L. Ed. 2d 429, 440 (2006); *State v. Duke,* 360 N.C. 110, 139-40, 623 S.E.2d 11, 30 (2005), *cert. denied,* —— U.S. ——, 127 S. Ct. 130, 166 L. Ed. 2d 96 (2006). If the record supports the trial court's decision that the juror could follow the law, then the trial court's ruling should be upheld on appeal. *See State v. Morgan,* 359 N.C. 131, 148-50, 604 S.E.2d 886, 897 (2004), *cert. denied,* 546 U.S. 830 (2005). Thus, the question we must consider in determining whether the trial court abused its discretion is whether the record fairly supports the conclusion that Lt. Goodson could perform his duties as a juror consistent with the trial court's instructions when considering mitigating evidence.

The duty of the appellate court is not to micromanage the jury selection process. Indeed, an appellate court should reverse only in the event that the decision of the trial court is so arbitrary that it is

void of reason. *Id.* Many citizens, like Lt. Goodson, have strong feelings about the efficacy of the death penalty and how a capital sentence is determined. However, merely because a prospective juror holds personal views that do not comport completely with the structure set out in N.C.G.S. § 15A-2000 does not disqualify that person from fulfilling his or her civic responsibility to serve on a jury. Moreover, the General Assembly's intent is to maximize the pool of qualified citizens who can serve as jurors. *See* N.C.G.S. § 9-3 (2005). Determinations of whether a juror would follow the law as instructed are best left to the trial judge, who is actually present during *voir dire* and has an opportunity to question the prospective juror. *See Lasiter*, 361 N.C. at 301-02, 643 S.E.2d at 911: "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. ——, 127 S. Ct. 2218, 2224, 167 L. Ed. 2d 1014, 1023 (2007) (citations omitted). After reviewing the substantial exchange between the parties, the trial court, and Lt. Goodson, we conclude, as did Justice Webb writing for this Court in *State v. Jackson*, 322 N.C. 251, 257, 368 S.E.2d 838, 841 (1988), *cert. denied*, 490 U.S. 1110 (1989): "We might not have reached the same result as the superior court but giving, as we must, deference to its findings, we hold it was not error" for the trial court to deny defendant's challenges of Lt. Goodson.

We conclude that the record fairly supports the trial court's conclusion that Lt. Goodson would follow the law as instructed. The statements made by Lt. Goodson were in response to incisive questions by both parties seeking to determine whether Lt. Goodson could follow the law. These questions were more specific and targeted than the general fairness and "follow the law" questions which alone are insufficient to make a determination of whether a juror will follow his oath. *See Morgan v. Illinois*, 504 U.S. 719, 734-36 (1992). The record indicates Lt. Goodson made statements which the trial court reasonably credited, such as "I would follow the law down to the line" and "if the Court instructs me to follow certain guidelines, I will follow them to the end." Additionally, this is not a case in which the trial court summarily denied defendant's challenge of a prospective juror; instead, the trial court elaborated upon its reasons for the denial. *See Lasiter*, 361 N.C. at 308, 643 S.E.2d at 914 (Brady, J., concurring) (explaining the helpfulness to a reviewing court of detailed findings by trial courts in rulings concerning jury selection). We cannot say that the trial court's decision to deny defendant's challenge of

Lt. Goodson on the basis of an alleged inability to consider circumstances in mitigation was an abuse of discretion.

Similarly, we cannot say that the trial court abused its discretion in rejecting defendant's argument that Lt. Goodson could not afford defendant the proper presumptions. In *State v. Jones*, this Court found no error in a trial court's denial of the defendant's challenge for cause of a prospective juror who insisted that there must be some evidence against the defendant since he was charged with a crime, stated that many defendants just wasted taxpayer money in proceeding to trial, and added that he believed the defendant should take the stand to defend himself. 342 N.C. 457, 470-75, 466 S.E.2d 696, 702-05, *cert. denied*, 518 U.S. 1010 (1996). However, after making those statements of opinion, the prospective juror indicated to the trial court that he would follow the law. *Id.* at 474, 466 S.E.2d at 704. This Court stated the trial court "could have concluded that [the prospective juror] may not have agreed with the presumption of innocence but would follow the law as given to him by the court. This was all that was required to deny the challenge for cause." *Id.* at 475, 466 S.E.2d at 704-05 (citing *State v. McKinnon*, 328 N.C. 668, 403 S.E.2d 474 (1991)).

Defendant argues this case is similar to *State v. Cunningham*, in which this Court ordered a new trial because a juror who was severely confused on the presumption of innocence was not removed for cause. 333 N.C. 744, 429 S.E.2d 718 (1993). In *Cunningham*, the prospective juror stated that "if [the defendant] doesn't want to prove his innocence, I would have to accept that." *Id.* at 752, 429 S.E.2d at 722. That prospective juror still indicated her confusion over the presumption of innocence after two detailed instructions from the trial court on the subject. *Id.* at 749-51, 429 S.E.2d at 720-21.

This case is more like *Jones* than *Cunningham* in that Lt. Goodson indicated numerous times that he would follow the law as instructed by the trial judge, and it is reasonable to believe that he understood that law. The only confusion in the instant case is from the label Lt. Goodson applied to the presumption of innocence. Lt. Goodson's answers make it clear that he viewed the presumption of innocence to be that until evidence is presented establishing defendant's guilt, defendant is "given the benefit of the doubt" and is presumed "not guilty until proven." Even defense counsel recognized that they were both considering the same presumption—just with a different label—noting that "[i]t may just be a lawyer thing." If the trial court's denial of the challenge for cause in *Jones* was not an

abuse of discretion even though the statements made by that prospective juror were much more provocative than those made by Lt. Goodson, we cannot say the trial court abused its discretion in rejecting defendant's argument that Lt. Goodson could not follow the law on the presumption of innocence.

Defendant's final argument pertaining to Lt. Goodson is that Lt. Goodson, as a member of the law enforcement community, was closely aligned with the prosecutor's office and would give more weight to law enforcement officers' testimony. The qualifications to serve as a juror are contained in North Carolina General Statute section 9-3, and the grounds for challenging a juror for cause are found in section 15A-1212. Neither the qualifications nor the grounds for challenging a juror for cause lead us to recognize any type of pro-phylactic rule prohibiting members of the law enforcement community from entering the jury pool. *See State v. Lee*, 292 N.C. 617, 234 S.E.2d 574 (1977).

During *voir dire*, Lt. Goodson admitted that he had previously worked with the attorneys now prosecuting the instant case, as would be common in the law enforcement community. This contact mainly consisted of Lt. Goodson seeking legal opinions from the prosecutors as to whether he should pursue criminal charges against certain suspects. Additionally, as would be expected, Lt. Goodson worked with members of the Wilmington Police Department in his capacity with the Carolina Beach Police Department. No one alleged that Lt. Goodson was involved in defendant's case in any way. However, exchanges between defense counsel and Lt. Goodson about his law enforcement employment and how that might influence his determinations of credibility demonstrate that Lt. Goodson would view each witness on the facts of the case and not automatically give the prosecution's law enforcement witnesses more weight:

MR. PETERS [Defense Counsel]: With the nature of your work and law enforcement over these 29 years have certainly brought you into the court system with some degree of regularity, I take it?

JUROR NO. 9: Yes, sir.

MR. PETER[S]: And the professional interactions have largely been with the prosecutors, at least, certainly by way of time, is that fair to say?

JUROR NO. 9: Yes, sir.

MR. PETERS: That would assist you in developing, working up your investigations?

JUROR NO. 9: Yes, sir.

MR. PETERS: When you come to this courtroom, do you feel more of an allegiance toward or a commonality with the prosecutors than you would defense lawyers in this case?

JUROR NO. 9: I don't believe so, no, sir.

MR. PETERS: But, obviously, the information that you would seek relating to your investigations, you would be relying on these folks and the prosecutor's office?

JUROR NO. 9: That's correct.

MR. PETERS: And that would indicate that you have a great respect for their opinions and their approaches to the work that they do?

JUROR NO. 9: Yes, sir.

MR. PETERS: And when you see them now come into court with a case and prosecution, wouldn't some of your views as your prior relations with those folks, be a factor in just your experiences as a professional?

JUROR NO. 9: I'm sure it would be a factor in that relationship. But I also happen to know defense lawyers that have represented the client that [I] [] have great admiration for. Professionally, I think that they did an outstanding job and [s]o to say I would value anybody, anyone on the law side, their opinion or the other, I can't say that I would. It's a case-by-case basis to me, counselor.

. . . .

MR. PETERS: You're not the first law enforcement officer whose [sic] been called to jury service for this case. And in response to one question an officer had indicated that he felt that he would attach more credibility to a law enforcement officer than to the defense lawyer. That was the comment. I saw you wince.

MR. DAVID [Prosecutor]: Objection to the form of that question.

THE COURT: Court sustained. Counsel, rephrase, then.

MR. PETERS: Would you share that point of view?

JUROR NO. 9: In your case, no, sir. In some cases, it's a possibility of that, yes, sir.

MR. PETERS: Thank you. But you do attach a great deal of credibility to law enforcement officers?

JUROR NO. 9: Yes, sir, I do.

MR. PETERS: That's certainly a part of your work on a day-to-day basis?

JUROR NO. 9: Yes, sir.

MR. PETERS: You trust those that you serve?

JUROR NO. 9: That I serve with, yes, sir.

MR. PETERS: And under anyone and under and over?

JUROR NO. 9: In some cases, yes, sir.

MR. PETERS: Depends on your associations with members of law enforcement?

JUROR NO. 9: Yes, sir.

MR. PETERS: And you feel a closeness to law enforcement officers, don't you?

JUROR NO. 9: Yes, sir.

MR. PETERS: This is something that goes—it really [is] in your bones, isn't it?

JUROR NO. 9: Yes, sir.

MR. PETERS: And you consider yourself a law enforcement officer 24 hours a day, don't you?

JUROR NO. 9: Yes, sir, I do.

MR. PETERS: And oftentimes go about armed.

JUROR NO. 9: Yes, sir, I do.

MR. PETERS: And you're prepared?

JUROR NO. 9: Yes.

MR. PETERS: When you leave you might be armed?

JUROR NO. 9: I will.

MR. PETERS: And if you're listening to the testimony of a law enforcement officer, wouldn't you be inclined to ascribe to that person more credibility than you may someone you don't know at all?

JUROR NO. 9: Not necessarily because I know them. But I would probably attribute it to their experience and expertise of what they're saying because they know what they're looking for and what they're looking at.

MR. PETERS: Well, when we're talking about—looking as if it were a matter of an officer seeing something and then an agreement with a civilian about what was seen or done in a situation like this, because of your background and your years and service to law enforcement, would you want to be more inclined to assign more credibility to the officer over, say, the civilian?

JUROR NO. 9: Yes, sir, because of their training, I would think I would.

MR. PETERS: Their training and your respect for the truthfulness that you feel attaches to those in service to law enforcement?

MR. DAVID: Objection to the form of that question.

THE COURT: Court sustained. Counsel may rephrase.

MR. PETERS: That you feel that those that you serve alongside with are truthful and responsible and credible people, don't you?

JUROR NO. 9: I hope so.

MR. PETERS: As you are?

JUROR NO. 9: I try to be, yes.

MR. PETERS: And you assign that to those in law enforcement, don't you, as a matter of fact, of course?

JUROR NO. 9: Yes, sir.

MR. PETERS: You trust people in law enforcement?

JUROR NO. 9: Yes, sir.

MR. PETERS: You consider them to be part of the same team that you're on and the work that you do, don't you?

JUROR NO. 9: Yes, sir.

MR. PETERS: So in this sense, do you feel, then, that if you're looking at a situation where an officer has testified and there is a multiple number of officers the, State's witnesses 20 or 30 officers testifying in a case, that would mean a lot to you, wouldn't it?

JUROR NO. 9: I would place it in proper respective [sic], counselor, as to what they saw, what they're testifying to. As far as giving them exceptional credibility over anything else, if I think that the facts don't match what they're saying, then I would not. But if it's mirroring up with what they're saying, I would say yes.

MR. PETERS: Well, this may be a different way to roll it around in your mind, but—not talking about necessarily this trial, but just in the general sense, your mind set of a case where a goodly number of officers may be testifying in a case, that is something that would suggest to you a strong case, isn't it?

JUROR NO. 9: Yes, sir.

MR. PETERS: And one officer after another after another—when I was younger, I believe there was [an] Elvis Presley album out, 50 million Elvis fans can't be wrong—you have an attitude that as officer[s] are testifying in a case, that certainly provides greater and greater strength to the State's prosecution?

JUROR NO. 9: To credibility, yes.

. . . .

MR. PETERS: Well, it can be difficult, but, I mean, the testimony of a police officer, would that be seen different from you than that of, say, a psychiatrist. I'm trying to understand your thoughts about psychiatric testimony and what the Court may say about what constitutes an expert.

JUROR NO. 9: I would not take a police officer over a psychiatrist. I would think No. 1, a police officer would not be testifying as to a mental state of a suspect and I would rely on a psychiatrist to provide some basis, mental status, mental condition of that subject at the time. So I don't equate police officers or psychiatrists in the same realm of testimony.

MR. PETERS: Could I ask about Defendants?

JUROR NO. 9: I'm sorry, what would your question be about Defendants?

MR. PETERS: How would you equate them in the realms of either psychiatric testimony or that of the law enforcement officer, in terms of credibility?

MR. DAVID: Well, objection.

THE COURT: Court sustained.

MR. PETERS: Do you feel that you could attach or assign the same degree of credibility to a person who's under an accusation of murder, first-degree murder, as you could a law enforcement officer?

JUROR NO. 9: I would need to qualify an answer to that. I couldn't say yes or no. I would need to elaborate on that if you want me to.

MR. PETERS: Would you do that for me, lieutenant.

JUROR NO. 9: If I had a Defendant that made an explanation in this case, testified as to the circumstances surrounding the incident, that, coupled with the facts, would be able to ascertain whether the Defendant was telling us the truth. And on the other hand, if that Defendant's version of the incident is so far afield that common sense doesn't even attach itself, then I could not give them the same credibility to their testimony that I would a police officer.

MR. PETERS: Do you feel that your experiences, your considerable experiences over the years, would color your ability to hear any defense that may be offered by a person accused in a case like this?

MR. DAVID: Objection. Stake out.

THE COURT: Objection. Overruled. You may answer.

JUROR NO. 9: I don't believe so, no, sir.

This case is indistinguishable from *State v. McKinnon*, 328 N.C. 668, 403 S.E.2d 474 (1991) with regards to Lt. Goodson's answers concerning law enforcement credibility. In that case, the defendant challenged a prospective juror for cause after the potential juror indicated that he would "possibly" give more credence to statements made by a police officer because of the police officer's training. *Id.* at

STATE v. CUMMINGS

[361 N.C. 438 (2007)]

675-76, 403 S.E.2d at 478-79. This Court noted that the prospective juror "indicated that he would not automatically give enhanced credence to testimony by any particular class of witness. Rather, certain factors in the witness's background, such as training or experience, would affect the credibility of that witness." *Id.* at 676, 403 S.E.2d at 479. In the case *sub judice*, Lt. Goodson indicated that he would be inclined under certain circumstances to give more credence to a law enforcement officer's testimony because of the officer's training when the facts "match up with what they are saying." He never indicated that he would automatically give more weight to any particular testimony, but steadfastly assured the parties and the trial court that he would look at each person's testimony in light of the other evidence in the case. Considering the entirety of the *voir dire* of Lt. Goodson, we cannot say the trial court abused its discretion in denying defendant's challenge for cause based on Lt. Goodson's alleged bias toward the prosecution and law enforcement personnel. Accordingly, these assignments of error are overruled.

### B. The Denial of Defendant's Challenge of Mr. Boston

[2] Defendant next contends that the trial court abused its discretion in denying his challenge of prospective juror Boston. Defendant argues that juror Boston would vote automatically for the death penalty in every first-degree murder case, and therefore, the trial court's failure to remove him for cause amounts to a violation of defendant's right to a fair and impartial jury as set out in *Morgan v. Illinois*, 504 U.S. 719 (1992). In recognizing a defendant's right to challenge a prospective juror for cause whenever that juror would "automatically vote for the death penalty in every case," *id.* at 729, the Supreme Court of the United States noted that "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." *Id.* at 735. As stated above, when determining whether the trial court erred in its decision to excuse a juror for cause, we give a high degree of deference to the trial court, which is better suited than a reviewing court "to assess the demeanor of the venire, and of the individuals who compose it." *Uttecht*, 551 U.S. at ——, 127 S. Ct. at 2224, 167 L. Ed. 2d at 1023.

During the rather lengthy *voir dire* of Mr. Boston, he indicated that he supported the death penalty, that if "you've taken a life, you don't deserve to live," that he personally would rather die than spend his life in prison, and that life imprisonment was cost-prohibitive compared with a sentence of death. Furthermore, Mr. Boston agreed with defense counsel's characterization of Mr. Boston's answers to

mean that if the murder was premeditated, cold-blooded, deliberate, and willful, the appropriate punishment would be death. When questioned by the prosecution, Mr. Boston indicated that, regardless of his views, he could follow the trial court's instructions on both the guilt-innocence and penalty proceedings and that he would return a sentence recommendation of life without parole if the State failed to meet its burden in the penalty proceeding. After hearing arguments on defendant's challenge of Mr. Boston, the trial court stated:

> The standard is whether a juror's views on capital punishment would prevent or substantially impair the juror in the performance of his duties in accordance with the instructions and the juror's oath, and a juror who is so committed to a view about the death penalty that the juror would not give up that view and follow the law must be excused. If a juror's view is so strong as the Morgan vs. Illinois standard, then the juror must be excused. If a juror indicates that the juror automatically would vote for the death penalty following a conviction for first degree murder, then the trial judge must remove him.

> This juror does have a view, it is a strong view, I believe he has indicated and this opinion or belief is one I think the Court does need to evaluate. The Court has had the benefit of viewing the juror in the courtroom, watching him, hearing him, observing him and his responses to difficult questions and the Court does note that prospective juror's biases might not always be provable by unmistakable clarity. Reviewing courts must defer to the trial judge's judgment whether the prospective juror would be able to follow the law impartially. Here is a juror who has stated repeatedly his opinion about it and his opinion is one that if a person has gone out, premeditated, took another person's life, no accident, no excuse, meant to do it and the State shows that beyond a reasonable doubt, then he feels that person should be sentenced to death. But when examined further about it, he does indicate that he still believes he can go through the process, he can keep an open mind, he can consider the aggravating and mitigating circumstances.

> He has indicated that he would not prejudge the sentence after the Defendant were convicted of first degree murder. If he were, then he can go through the sentencing process and was asked point-blank if the State fails in its burden in the sentencing proceeding, he indicated he'd return a life without parole. A potential juror who indicates that he believes that a person

should be sentenced to death after a conviction for first degree murder can still serve.

Likewise, a potential juror who says that he or she believes a person should receive life imprisonment without parole after a sentence or a conviction of first degree murder can still serve.

The question is whether that view or that opinion is so strong that it would prevent or substantially impair that juror in carrying out his or her view. In the final analysis of this juror, this juror can do that, he can set that view aside and return life if it's called for by the evidence and return death if it's called for by the evidence.

The Court is of the view his view does not prevent or substantially impair him in carrying out his duty as a juror. The motion to excuse for cause is denied.

After further questioning by both defense counsel and the prosecution, defendant renewed his challenge for cause after Mr. Boston indicated that the appropriate penalty would be death if the State proved an aggravating circumstance beyond a reasonable doubt. In denying the renewed challenge for cause, the trial court stated:

All right, the Court has had ample opportunity to consider this juror and we are dealing with an esoteric, convoluted, confusing area of the law. Jurors are easily confused. This juror, I think, is confused. He indicated when he was examined by Counsel for the Defendant that if we get to the place all of us decide that it is premeditated murder with specific intent, then we're at the punishment level. Then the State proves an aggravating circumstance beyond a reasonable doubt and if fully satisfied and entirely convinced, would you feel that the appropriate punishment would be the death penalty. Answer, yes. The Defendant made a motion renewing the challenge for cause but then followed up by another question in which he was asked if he would be able to set that opinion aside and essentially the juror said he would not set that opinion aside.

Well, the renewed challenge for cause I thought was very appropriate. Here at this late stage, we're getting a juror who still is not quite understanding. In fact, when the State started asking him a question, he previewed his remarks with I didn't understand the question, right. So he didn't. And when he was asked again to go through, to walk through the process, he did indicate finally that there was nothing about his personal beliefs that

would prevent him being a fair juror and consider the sentencing options. He was asked if there was anything about his beliefs that would prevent or substantially impair him from considering the sentence of life imprisonment without parole or death. He said no. He indicated again that he could keep an open mind and listen to the evidence and could return a sentence of life if the D.A. failed to prove what he is required to prove.

The Court is of the view, again, his view, although a juror that has been confused about it, at this point is not one that has a view that would prevent or substantially impair him from carrying out his duty as a juror in the case.

The renewed motion for challenge for cause is denied.

After a recess, defense counsel requested that the court allow him to ask Mr. Boston one final question. After discussion and argument, the trial court allowed defense counsel to ask Mr. Boston the following question: "Mr. Boston, if a person were to be convicted of cold-blooded, first degree murder, is it your view that you would vote for the death penalty every time?" Mr. Boston answered, "Yes, sir."

Upon receiving this answer, defendant renewed his challenge for cause. The prosecutor then questioned Mr. Boston, and he again indicated that he would follow the law. Defense counsel then asked Mr. Boston: "Just the question I asked was, to be clear, that if a person were to be convicted by you as a juror of first degree, cold-blooded, premeditated murder would you vote for the death penalty then every time?" Mr. Boston responded, "If all the facts are proven to me, yes." Mr. Boston later clarified his view: "I just feel that if every fact can be proven, I believe in the death penalty. If it's not proven, I believe that life without parole." When asked what needed to be proved, Mr. Boston responded:

If every fact has not been proven, like he talked about, the tight-knit process, the four steps. If he doesn't prove all four steps then it would be life without parole, but if he proves everything without a shadow of a doubt, or however you want to say it, then I will vote basically for death. If the State proves everything, everything, every fact, do you understand what I'm saying?

(Emphasis added.)

After defendant renewed his objection to Mr. Boston's service, the trial court once again denied the challenge. Toward the end of the

jury selection process, but before alternate jurors were to be chosen, defendant once again asked the trial court to reconsider its ruling on this issue. The trial court then ruled:

The Court reconsiders the matter then, pursuant to 15A-1214(h) and [i] to reconsider the facts and arguments that have been made and additional arguments that have been made to determine whether this juror should have been excused for cause. Kenneth Boston, the juror in Seat 7 was an interesting fellow. He is a butcher. Historically, I think we learned that butchers are supposed to be pro defendant; typically they will not return a verdict of guilty. So starting out with some idea about the gentleman, I was surprised to find that he had some strong opinions, and he did. He believed that the death penalty is a necessary law, and indicated why should we burden ourselves with the expense, why keep financing the burden. And so leading off on that, it certainly gave the Court pause.

. . . Our appellate courts have been particularly excellent in allowing the trial judge the benefit of the doubt about determinations made concerning a juror's service. The cold record, if you read that, of Mr. Boston's examination, I think you can pick out any number of spots in that record where he has said things that would make you think that he did have a view that would prevent or substantially impair him in carrying out his duty as a juror. But in looking at the totality of it, again, here is a gentleman who was challenged for cause and he had ample opportunity to sit then and he was challenged at least twice, possibly three times, and he did, I think, have a lot of confusion about it. He did indicate that he still believed if you went through the process, even though he had the views he told us about, he thought he could keep an open mind, he could still consider aggravating and mitigating circumstances, and indicated he would not prejudge the sentence after the Defendant was convicted of first degree murder, if he were, but he could go through the sentencing process and he indicated that if the District Attorney fails, he would return life without parole.

He did indicate after, I think, he finally understood it, if a person had gone out and premeditated, took another person's life, no accident, no excuse, no self-defense, the State shares every bit of that in sentencing, that asked if would he have felt that then should the sentence be death, he said yes, it would be tough, but

indicated as well that he could go through the sentencing process and not prejudge, keep an open mind, consider aggravating and mitigating. And in the Court's view he is just the kind of juror we're looking for, someone who can understand this very convoluted, complicated process and who can, even if they come in with a strong feeling about any number of things, can lay that aside, leave it out of the courtroom and determine his verdict based on what we present to him. He has convinced the Court he can do that. This Court has had the advantage over anyone who might read the cold record. I have been able to look him in the face, I've been able to hear him talk, and I've been able to watch him as the lights went off and slowly he came to an awakening of what was desired of him. The juror passes then and passes now and the Court denies the motion to excuse this juror for cause.

The trial court's extensive findings and explanation of its reasoning are helpful in demonstrating that the trial court's decision was not arbitrary or without thought. These lengthy passages indicate that the trial court was attentively listening to the questions and the answers given during *voir dire*. "A trial court abuses its discretion if its determination is 'manifestly unsupported by reason' and is 'so arbitrary that it could not have been the result of a reasoned decision.'" *Lasiter*, 361 N.C. at 301-02, 643 S.E.2d at 911 (quoting *White*, 312 N.C. at 777, 324 S.E.2d at 833). After reviewing the totality of Mr. Boston's *voir dire*, we cannot say that the trial court's decision was "manifestly unsupported by reason."

This case is similar to *State v. Hedgepeth*, 350 N.C. 776, 792-95, 517 S.E.2d 605, 615-16 (1999), *cert. denied*, 529 U.S. 1006 (2000). In *Hedgepeth*, a prospective juror indicated that she preferred death in first-degree murder cases, but upon further questioning, also indicated that she could put aside those opinions and follow the law. *Id.* This Court held that the trial court did not abuse its discretion because of the prospective juror's later answers which indicated she would follow the law. *Id.* at 794-95, 517 S.E.2d at 616. In the instant case, Mr. Boston, who at first appeared confused and a strong proponent of the death penalty in premeditated murder cases, later indicated to counsel that he would follow the law and that he would return a recommendation of life imprisonment without parole if the State failed to meet its burdens of proof and persuasion during the penalty proceeding. Accordingly, we cannot say the trial court abused its discretion in denying defendant's challenge for cause of Mr. Boston. These assignments of error are overruled.

### C. The Refusal to Allow Defendant to Ask "Stake Out" Questions on Voir Dire

**[3]** Defendant argues that the trial court erred in sustaining prosecution objections to certain questions asked by defense counsel during *voir dire*. The prosecution contended that these questions were "stake out" questions meant to determine how a juror would vote in the case and were attempts to lock the jurors into a certain position by asking hypothetical questions that mirrored some of the mitigating evidence defendant intended to present in a possible penalty proceeding. In particular, defendant argues the trial court abused its discretion in not allowing him to question prospective jurors on what they might view as harm experienced by a child exposed to domestic violence, the effects on children who had been exposed to physical abuse, whether a prospective juror believed her grandson was harmed by fights between his parents, whether a juror believed that a woman who was abused has the ultimate responsibility to protect her children, how a particular family was affected by alcohol abuse, why a juror thought people would abuse hard drugs, and whether, in a prospective juror's personal experience, the effects of drug abuse were negative.

Two purposes of *voir dire* are to allow the parties (1) to determine whether there exists a reason to challenge a prospective juror for cause; and (2) to intelligently exercise their limited number of peremptory challenges. *See State v. Syriani*, 333 N.C. 350, 372, 428 S.E.2d 118, 129, *cert. denied*, 510 U.S. 948 (1993). Allowing adequate *voir dire* is essential in guaranteeing a defendant's right to a fair and impartial jury. *See Morgan*, 504 U.S. at 729. However, there are limits on *voir dire* examination. A defendant is not entitled to put on a minitrial of his evidence during *voir dire* by using hypothetical situations to determine whether a juror would cast a vote for his theory. *See State v. Leroux*, 326 N.C. 368, 384, 390 S.E.2d 314, 325 (stating that "counsel is not permitted to 'fish' for legal conclusions or argue its case during *voir dire*"), *cert. denied*, 498 U.S. 871 (1990). Moreover, "[i]n this jurisdiction counsel's exercise of the right to inquire into the fitness of jurors is subject to the trial judge's close supervision. The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion." *State v. Bryant*, 282 N.C. 92, 96, 191 S.E.2d 745, 748 (1972), *cert. denied* 410 U.S. 958, *and cert. denied* 410 U.S. 987 (1973).

We cannot say the trial court abused its discretion in sustaining objections to the questions at issue. Defendant planned to present

evidence of physical child abuse, alcohol abuse, and drug abuse. The trial court gave defendant wide latitude to determine whether prospective jurors had been personally involved in any of those situations; however, it was within the trial court's authority to limit questioning on these matters and not permit the hypothetical and speculative questions that the trial court could have determined were being used to try defendant's mitigation evidence during *voir dire. See State v. Ball,* 344 N.C. 290, 304, 474 S.E.2d 345, 353 (1996), *cert. denied,* 520 U.S. 1180 (1997); *State v. Jones,* 339 N.C. 114, 136, 451 S.E.2d 826, 836 (1994), *cert. denied,* 515 U.S. 1169 (1995); *State v. Mash,* 328 N.C. 61, 63-64, 399 S.E.2d 307, 309 (1991). Accordingly, this assignment of error is overruled.

### D. The Refusal to Allow Defendant's Questions on Incarceration and Death Penalty Costs

**[4]** Defendant assigns as error the trial court's ruling prohibiting defense counsel from questioning prospective jurors on whether their decisions would be influenced by their ideas about the costs of life imprisonment versus the costs of a death sentence. This Court recently decided this issue in *State v. Elliott,* 360 N.C. 400, 409-10, 628 S.E.2d 735, 742, *cert. denied,* — U.S. —, 127 S. Ct. 505, 166 L. Ed. 2d 378 (2006), which held that a trial court did not abuse its discretion in prohibiting the defendant from questioning jurors on their views about death penalty versus life imprisonment costs. *Id.* Defendant respectfully has asked the Court to reconsider this decision. We have considered defendant's arguments *sub judice* and decline to overrule our decision in *Elliott.* We therefore hold that it was within the trial court's discretion, consistent with *Elliott,* to prohibit defendant from seeking the jurors' views on punishment costs. This assignment of error is overruled.

## II. Penalty Proceeding

**[5]** Defendant assigns as error the trial court's refusal to allow him to present to the jury during penalty proceeding closing argument an exhibit containing the statement that life imprisonment is the presumptive sentence for first-degree murder "unless and until the prosecution proves otherwise." We note at the outset that the trial court has broad discretion to control the scope of closing arguments. *See State v. Allen,* 360 N.C. 297, 306, 626 S.E.2d 271, 280, *cert. denied,* — U.S. —, 127 S. Ct. 164, 166 L. Ed. 2d 116 (2006). This Court will find error in such instances " 'only upon a showing that [the trial court's] ruling could not have been the result of a reasoned decision.' " *State*

*v. Augustine*, 359 N.C. 709, 734, 616 S.E.2d 515, 533 (2005) (quoting *State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996)), *cert. denied,* —— U.S. ——, 126 S. Ct. 2980, 165 L. Ed. 2d 988 (2006). Counsel also enjoys a wide latitude of discretion in closing arguments, although this discretion is not without limits. *See Allen*, 360 N.C. at 306, 626 S.E.2d at 280 (citing *State v. Call*, 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998)). Nonetheless, proposed statements inviting error do not warrant relief, *see Elliott*, 360 N.C. at 410-11, 628 S.E.2d at 743, and statements which cannot be supported by relevant authority but merely assert the personal opinion of counsel on the law may properly be excluded by the trial court in its discretion. *See State v. Flowers*, 347 N.C. 1, 36-37, 489 S.E.2d 391, 412 (1997) (citing *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979)), *cert. denied*, 522 U.S. 1135 (1998).

Here, defense counsel was invited to respond to the State's objection to the use of the word "presumption." In response defense counsel stated: "Nowhere does it say that this is the law, this is just our contention . . . ." Defendant's admission that his assertion that life was the presumptive sentence was nothing more than defense counsel's "contention" of the law amounts to invited error, and, therefore, even if we were to find the trial court's ruling erroneous, defendant cannot show prejudice. *See* N.C.G.S. § 15A-1443(c) (2005) ("A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct."). This assignment of error is overruled.

**[6]** Defendant next argues that the trial court erred in failing to intervene during the prosecution's penalty proceeding closing argument when the prosecutor began to discuss how defendant's crime was committed "for money." In the context of explaining to the jurors how he believed they should weigh the aggravating factors, the prosecutor stated:

> But sadly we're not done. No, we're not done. He did it for money. That's the very worst kind of crime because everyone is a potential victim who is sitting on his or her wallet right now. So that has to go on the scale. Put this on the scale and multiply it by 16. You've seen it, taking it out of its sheath bent on killing.

Defense counsel did not object to this statement. The trial court had decided to submit the section 15A-2000(e)(5) aggravating circumstance that the murder occurred while defendant was also committing robbery with a dangerous weapon, but not the (e)(6) aggravator

that the murder was committed for pecuniary gain. The trial court was limited to submitting only one of these aggravators by *State v. Quesinberry*, 319 N.C. 228, 238, 354 S.E.2d 446, 452 (1987), *judgment vacated on other grounds*, 494 U.S. 1022 (1990), which held that in cases of premeditated murder in which there was also a robbery with a dangerous weapon with an underlying motive of pecuniary gain, it is only permissible to submit either the (e)(5) or (e)(6) aggravating circumstance, as "one plainly comprises the other."

This Court has stated the standard for examining whether a trial court erred in not intervening *ex mero motu* during a closing argument:

> In a hotly contested trial, such as a capital case, "[t]he scope of jury arguments is left largely to the control and discretion of the trial court, and trial counsel will be granted wide latitude." *State v. Call*, 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998). Counsel may argue any facts in the record and any reasonable inference that may be drawn from any facts in the record. *See id.* . . . However, we will not find error in a trial court's failure to intervene in closing arguments *ex mero motu* unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair. *Id.* at 419-20, 508 S.E.2d at 519.

*Allen*, 360 N.C. at 306-07, 626 S.E.2d at 280 (brackets in original).

Defendant contends that the trial court's failure to intervene was error because the prosecution's argument amounted to the State asking the jurors to add sixteen pecuniary gain aggravators to their calculations. Defendant argues that this left the impression that the jury could consider defendant's desire for pecuniary gain although a pecuniary gain aggravating circumstance was not submitted. We disagree. It would be proper for the jury, under the facts of this case, to consider defendant's motive for pecuniary gain in the commission of the murder through the N.C.G.S. § 15A-2000(e)(5) robbery with a dangerous weapon aggravating circumstance. After considering the statement in context, the record indicates that the prosecution was alluding to the fact that there were sixteen jurors in the jury box "sitting on [their] wallet[s] right now," not that the jury should find sixteen pecuniary gain aggravating circumstances. Considering the entirety of the statement, we cannot say that it rendered the trial fundamentally unfair. Instead, the statement appears to be a valid argument concerning a topic on which the jurors would soon deliberate: The weight each juror would give to the aggravating circumstances as

compared with the mitigating circumstances. These assignments of error are overruled.

[7] Defendant argues that the trial court abused its discretion in overruling his objection when the prosecutor requested to use a chart that stated in part: "The armed robbery during the premeditated murder is an aggravating factor." Additionally, defendant also argues that the trial court erred in allowing the prosecution to tell the jury it had already found the N.C.G.S. § 15A-2000(e)(5) aggravating factor, even though defendant did not object to those statements. We reject both of defendant's arguments. First, N.C.G.S. § 15A-2000(e)(5) states that the commission of robbery with a dangerous weapon during the commission of first-degree murder is an aggravating circumstance to be considered. Thus, it was not an abuse of discretion for the trial court to allow, for illustrative purposes, a chart that made a correct statement of the law. Moreover, we reject defendant's arguments regarding the statements made by the prosecutor that the jury had already found the aggravating circumstance. The prosecution relayed to the jury that the State must prove the aggravators beyond a reasonable doubt, and then defense counsel, with defendant's permission, conceded to the jury that the prosecution had, indeed, proved the aggravating circumstances beyond a reasonable doubt. We cannot, therefore, say that these statements "were so grossly improper they rendered the trial and conviction fundamentally unfair." *Allen*, 360 N.C. at 306-07, 626 S.E.2d at 280. These assignments of error are overruled.

[8] Defendant next argues the trial court erred in failing to intervene *ex mero motu* in the prosecution's closing argument when the prosecution read a certain letter from the victim's son. The letter was shown in a crime scene photograph of the victim's living room, but the actual letter was not in evidence. Defendant does not argue that the letter would have been inadmissible had it been offered. *See id.* at 310, 626 S.E.2d at 282 (recognizing admissibility of victim-impact evidence). Considering the entirety of the record, the reading of the letter by the prosecution without defendant's objection was not "so grossly improper [it] rendered the trial and [sentence] fundamentally unfair." *Id.* at 306-07, 626 S.E.2d at 280. This is especially true considering the trial court's admonitions to the jurors "to rely solely upon your recollection of the evidence in your deliberations" and that final arguments "are not evidence." This assignment of error is overruled.

[9] Defendant's final closing statement argument is that the trial court erred in failing to intervene *ex mero motu* when the prosecutor

stated: "They want to talk about compassion, mercy. That's not the law. That's not the standard. If it was, you wouldn't forget about the compassion and mercy that he showed for her. No, don't base it on any of that." Defendant states that this "was a patent misstatement of law designed to misdirect the jury from its constitutionally imposed function." Yet, this Court has stated that "prosecutors may properly argue to the sentencing jury that its decision should be based not on sympathy, mercy, or whether it wants to kill the defendant, but on the law." *State v. Frye*, 341 N.C. 470, 506, 461 S.E.2d 664, 683 (1995), *cert. denied*, 517 U.S. 1123 (1996). Considering that the argument was not improper, it did not render the sentencing proceeding fundamentally unfair. This assignment of error is overruled.

[10] Defendant argues that the trial court erred in instructing the jury pursuant to N.C.G.S. § 15A-2000(f)(1) as the evidence was insufficient to support a jury finding that defendant's prior criminal history was insignificant. This error, defendant contends, opened the door for the jury to "view the mitigation submitted with cynicism and skepticism," and to "irrationally fail to find factors uncontrovertedly supported by evidence or conclude that the substantial mitigation found nonetheless fails to outweigh" the proven aggravating circumstances. Defendant did not include the (f)(1) mitigating circumstance in his proposed list of mitigators. However, the trial court said it would include the mitigator, and it set out the instruction it would give to the jury, including language indicating that defendant had not asked for this mitigating circumstance but that the court was required to submit it as a matter of law. The trial court invited defense counsel to speak as to any objection, correction, addition or special requests in regard to the instructions as set out, but defendant had no correction or objection regarding the (f)(1) mitigating circumstance at that time.

In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule of law without any such action may still be the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error. *See* N.C. R. App. P. 10(c)(4). When a defendant does not allege plain error, the question may still be reviewed in the exercise of the Court's discretion. *See* N.C. R. App. P. 2. "[P]lain error analysis applies only to instructions to the jury and evidentiary matters." *State v. Cummings*, 352 N.C. 600, 613, 536 S.E.2d 36, 47 (2000) (quoting *State v. Greene*, 351 N.C. 562, 566, 528 S.E.2d 575, 578, *cert. denied*, 531 U.S. 1041 (2000)), *cert. denied*, 532 U.S. 997 (2001). We have considered submission of

the (f)(1) circumstance to the jury reviewable under a plain error analysis. *See State v. Williams*, 355 N.C. 501, 584, 565 S.E.2d 609, 657 (2002) (citing N.C. R. App. P. 10(c)(4)), *cert. denied*, 537 U.S. 1125 (2003).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (brackets in original) (internal quotation marks omitted) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982) (second brackets in original) (footnote call numbers omitted), *cert. denied*, 459 U.S. 1018 (1982)). However, before engaging in plain error analysis it is necessary to determine whether the instruction complained of constitutes error. *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468, *cert. denied*, 479 U.S. 836 (1986). The appellate court " 'must be convinced that absent the error the jury probably would have reached a different verdict.' " *Id.* (quoting *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986).

When deciding whether to submit the statutory mitigating (f)(1) circumstance to the jury, the trial court must review the evidence to determine whether substantial evidence exists to support the submission. N.C.G.S. § 15A-2000(b) (2005); *see also State v. Polke*, 361 N.C. 65, 70, 638 S.E.2d 189, 192 (2006) (citing *State v. Daniels*, 337 N.C. 243, 272-73, 446 S.E.2d 298, 316 (1994), *cert. denied*, 513 U.S. 1135 (1995)). The trial court must determine if, based on the evidence, any rational juror might conclude that the defendant had no significant history of prior criminal activity. *State v. Jones*, 339 N.C. 114, 157, 451 S.E.2d 826, 849-50 (1994) (citing *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988)), *cert. denied*, 515 U.S. 1169 (1995). This determination is not based merely on the number of prior criminal activities but also on the nature and age of the activities. *State v.*

*Sexton*, 336 N.C. 321, 375, 444 S.E.2d 879, 910 (citing *State v. Artis*, 325 N.C. 278, 314, 384 S.E.2d 470, 490 (1989), *judgment vacated on other grounds*, 494 U.S. 1023 (1999)), *cert. denied*, 513 U.S. 1006 (1994). Even if the defendant does not request the submission of the (f)(1) mitigator or objects to its submission, the trial court must submit the circumstance when it is supported by sufficient evidence. N.C.G.S. § 15A-2000(b); *Polke*, 361 N.C. at 71, 638 S.E.2d at 193 (citing *State v. Lloyd*, 321 N.C. 301, 311-12, 364 S.E.2d 316, 323, *judgment vacated on other grounds*, 488 U.S. 807 (1988)). *See also State v. Watts*, 357 N.C. 366, 377, 584 S.E.2d 740, 748 (2003), *cert. denied*, 541 U.S. 944 (2004).

As defendant did not object to the instruction on the (f)(1) mitigator or argue plain error to this Court, this issue was not properly preserved. However, we will consider the issue as presented to prevent manifest injustice. *See* N.C. R. App. P. 2. Evidence in the case *sub judice* is more than sufficient to support submission of the (f)(1) circumstance. Both the nature and the recency of defendant's prior criminal activities are such that a rational juror could find his history insignificant. A rational juror could conclude that defendant's underage alcohol and illegal drug use were minor offenses and thus insignificant when considered in light of the total circumstances. Likewise, the trial court could have reasonably believed a rational juror would find the robbery of Eula Cauldwell to be insignificant because the robbery was so close in time to the robbery and murder at issue and was an aberration in an otherwise insignificant criminal background. Therefore, as there was sufficient evidence presented upon which a rational juror could reasonably find defendant's prior criminal history to be insignificant, we find there was no error on the part of the trial court that would amount to plain error. This assignment of error is overruled.

### III. Motion for Appropriate Relief

On 13 September 2004, less than a week after he was sentenced to death, defendant filed a motion for appropriate relief pursuant to N.C.G.S. § 15A-1413(b) and 1414 seeking to vacate his first-degree murder conviction and death sentence. In the motion, defendant alleged that the prosecution's decision to proceed capitally was influenced by improper considerations of race and political aspirations. The trial court subsequently denied the motion. Defendant does not argue that the trial court's findings of fact in its order denying the motion are unsupported by the record, and upon a review of the record we conclude those findings are supported by competent evi-

dence. Accordingly, the trial court's findings of fact are conclusive on appeal. *See State v. Wiggins*, 334 N.C. 18, 38, 431 S.E.2d 755, 767 (1993).

The trial court found, *inter alia*: After defendant murdered Jane Head on 4 October 2002, the Death Penalty Review Team of the Office of the District Attorney of the Fifth Prosecutorial District considered whether the case against defendant should proceed capitally. The team considering defendant's case was composed of the District Attorney and two Assistant District Attorneys, neither of whom was Ben David. The Death Penalty Review Team considered multiple factors in its decision, but none of those factors included racial or political considerations. After the Review Team decided the case was to be tried capitally, defendant made an offer to plead guilty to first-degree murder in exchange for a sentence of life without parole. The prosecution rejected this offer as it felt it had a strong case against defendant and that the strength of the case was growing daily. On 28 June 2004, District Attorney John Carriker announced his retirement and endorsed then-Assistant District Attorney Ben David for appointment by the Governor to serve as interim District Attorney and to be elected as the next District Attorney. On 19 July 2004, defendant's trial began, with Assistant District Attorney Ben David serving as lead prosecutor. The Governor appointed Assistant District Attorney John Sherrill as interim District Attorney, and Sherrill assumed that position on 2 August 2004. Additionally, on 2 August 2004, Ben David announced his candidacy for District Attorney.

During the summer of 2004, both the Office of the District Attorney and the Office of the Capital Defender were assisted by interns. Jeremy Eicher, a student at Duke University School of Law, and Sarah McCauley, a student at Harvard University School of Law, assisted Ben David in defendant's case. Defendant was sentenced to death on 8 September 2004, and on 9 September 2004, Jeremy Eicher was asked to discuss defendant's case in a Death Penalty Clinic presented by Duke Law School Professor James Coleman and Adjunct Professor Gretchen Engel. Death Penalty Clinic students Stephanie Bradford, Noah Clements, and David Fuhr, along with Adjunct Professor Engel inferred that Eicher was attributing statements to Ben David to the effect that David sought the death penalty against defendant because defendant, although a Lumbee Indian, appeared Caucasian. Therefore, some students surmised, David could seek the death penalty against Curtis Dixon, a black male, who was charged with murdering a white female University of

North Carolina at Wilmington student, and avoid any allegations of racial discrimination. The trial court concluded that the inferences made by these students and Adjunct Professor Engel were incorrect.

Professor James Coleman testified that he construed Eicher's statements as illustrations and hypothetical statements explaining why the prosecution would seek the death penalty for defendant and not as a report of actual statements made by Ben David. Professor Coleman opined that he did not believe any of the students were under the impression that Eicher was saying that Ben David did not accept defendant's plea offer to avoid an allegation of racial discrimination.

Ben David testified that he did not make the statements attributed by inference to him by Bradford, Clements, Fuhr, and Professor Engel. He also testified that defendant's race and the political campaign had no bearing on the decision to proceed capitally against defendant. The trial court found that Eicher did not relate the statements or views of Ben David, that David did not make the statements inferred to him, and that David did not use racial or political considerations in deciding to· reject the plea offer. Consistent with these findings of fact, the trial court concluded as a matter of law that defendant's rights under the United States and North Carolina Constitutions were not violated and accordingly denied defendant's motions for appropriate relief and to vacate his conviction and sentence.

**[11]** Defendant assigns error to the trial court's refusal to admit student David Fuhr's affidavit as substantive evidence and to admit it only for the purpose of corroborating his testimony given at the motion for appropriate relief evidentiary hearing. On 10 September 2004, Fuhr met with defendant's attorney Staples Hughes concerning the discussion that took place the prior day in the Death Penalty Clinic. Hughes memorialized the discussion in the form of an affidavit, and Fuhr made certain corrections to the affidavit. However, Fuhr did not sign the affidavit in September 2004. On 20 January 2005, four days before the motion for appropriate relief evidentiary hearing, Fuhr signed the affidavit. Fuhr testified that he could only relate generally what happened in class on 9 September 2004, but that his memory of the events was clear when he signed the affidavit just four days earlier. Defendant offered the affidavit as substantive evidence under N.C.G.S. § 8C-1, Rule 803(5) as a past recollection recorded. The trial court ruled that an insufficient foundation had been laid for

the affidavit, and Fuhr testified extensively on his recollection of the events at issue:

> I recall that prior to the day of this class session on September 8th, I received, along with other members of the class, an e-mail from Jeremy Eicher, I believe, that had an attachment or an addition describing the outcome of the Cummings case. And Jeremy, I believe, in the e-mail stated that he would be talking in class the next day about that because he had worked on it this summer when he was interning with the prosecution here. In class, and I remember the theme at the time was mitigation. Professor Coleman actually at the beginning of class remembered or recalled or remarked that this hypothetical case that we were dealing with as an example was strikingly similar to the case of Paul Cummings, and we proceeded to talk about this hypothetical mitigation case at the beginning of class.

> But towards the latter part of the class, Professor Coleman asked Jeremy to talk about his experience with the Cummings case this summer and Jeremy did so and initially said—he talked about the facts of the case and the details and I believe he remarked that in his mind, there were more atrocious cases, more egregious cases than the Cummings case, that there had been some mitigating evidence. Again, mitigating evidence being the theme of that day in class.

> So he discussed the case and then I remember Stephanie Bradford asked a question about the race of the Defendant to which Jeremy said that he was a member of a Native American tribe but he looked white.

> The discussion continued. I think then Jeremy talked about this other case that recently had occurred in this area where an African American male had committed a murder of a white college student here in Wilmington and, to the best of my recollection now, he remarked that that case had been more atrocious and egregious than the Cummings case. Then I think again Stephanie asked why did Cummings not do a plea bargain or why did Cummings get the death penalty as well if the other case was more atrocious, and then Jeremy talked about issues of race and politics and campaigning. He attributed some remarks to Mr. David that went along the lines of something like, I can't—for political purposes I can't get or I can't seek the death penalty in

this—I cannot not seek the death penalty in the Cummings case if I seek it in the other case of the black defendant.

That was more or less what I remember from the class. Then the discussion continued. Stephanie and Jeremy had a—not heated, but pretty intense exchange and that was more or less the end of the class.

After this testimony, defense counsel stated: "Your Honor, Mr. Fuhr has now testified and now I'm not seeking it under 803(5), I'm seeking it merely as corroboration of his previous testimony." However, when the trial court admitted the affidavit as corroboration and not as substantive evidence under Rule 803(5), defense counsel took exception to that ruling.

North Carolina Rule of Evidence 803 provides, in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(5) Recorded Recollection.—A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

N.C.G.S. § 8C-1, Rule 803 (2005). Considering the detail and extensiveness of Fuhr's testimony concerning the incidents that occurred in the Death Penalty Clinic class, defendant failed to show that Fuhr had "insufficient recollection to enable him to testify fully and accurately." That Fuhr testified he had a clear memory of the 9 September 2004 events four days before his 24 January 2005 testimony, but that his recollection was insufficient during his testimony, indicates the trial court did not err in receiving the affidavit solely as corroboration of Fuhr's testimony. Merely because a witness's testimony does not match up exactly word-for-word with a previously recorded recollection does not render the recorded recollection admissible under Rule 803. Accordingly, this assignment of error is overruled.

[12] Defendant additionally assigns as error the trial court's decision to allow Professor James Coleman to testify that he believed Eicher's discussion only showed that David was illustrating a race-neutral policy and was not talking about the actual decision made in defendant's case. The trial court admitted that evidence pursuant to Rule of Evidence 701, which provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue. .

*Id.*, Rule 701 (2005). The issues during the motion for appropriate relief evidentiary hearing were: (1) what Eicher said to the class; (2) whether David made those statements to Eicher; and (3) whether the decision to prosecute defendant capitally was based upon racial or political considerations. The testimony given by Coleman satisfied Rule 701, as his opinion on what Eicher meant was based on his personal perception of the statements made. Additionally, Coleman's opinion would be helpful in determining whether the decision to prosecute defendant capitally was based upon racial or political considerations—just as defense witnesses' testimony concerning their inferences drawn from Eicher's class presentation was helpful in determining that same issue. Because no verbatim transcript of the class discussion existed, the opinion of those present helped the trial court determine whether the statements allegedly attributed to David indicated a denial of defendant's constitutional rights. Thus, the trial court did not err in admitting the testimony. The assignment of error is overruled.

## IV. Preservation Issues

Defendant raises four preservation issues: (1) the "especially heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally vague and overbroad; (2) the trial court lacked jurisdiction to enter a death sentence because the aggravating circumstances were not included in the indictment; (3) the trial court lacked jurisdiction because the short-form murder indictment was insufficient; and (4) defendant's death sentence violates international law. We have considered all of these arguments and decline to overrule our prior precedent. *See Allen,* 360 N.C. at 316-18, 626 S.E.2d at 286-87 (rejecting each of these arguments). These assignments of error are overruled.

## V. Proportionality

[13] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now consider: (1) whether the record supports the aggravating circumstances found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the facts of the crime and the defendant. *See* N.C.G.S. § 15A-2000(d)(2) (2005).

The jury found three aggravating circumstances to exist beyond a reasonable doubt: (1) defendant had previously been convicted of a felony involving the threat of violence to a person, *id.* § 15A-2000(e)(3) (2005); (2) the murder was committed while defendant was engaged in the commission of a robbery with a dangerous weapon, *id.* § 15A-2000(e)(5) (2005); and (3) the murder was especially heinous, atrocious, or cruel, *id.* § 15A-2000(e)(9) (2005). The evidence supports these aggravating circumstances. Defendant had previously been convicted of robbery with a dangerous weapon of Eula Cauldwell, evidence of which was sufficient for the jury to find the (e)(3) aggravator. The evidence also tended to show that defendant murdered Jane Head to rob his victim of her ATM card and PIN number, which sufficiently supports the (e)(5) aggravating circumstance. The evidence also supports the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Defendant murdered Mrs. Head while she was in the supposed safety of her own home, stabbing her numerous times in the face and leaving her bleeding after rendering her helpless to prevent her impending death. This evidence was sufficient for the jury to find the (e)(9) aggravating circumstance.

Nothing in the record indicates that the sentence of death was entered under the influence of passion, prejudice, or any other arbitrary factor. Instead, the record shows that the jury considered and weighed each aggravating and mitigating circumstance and rendered its recommendation based upon the law. Accordingly, we will not disturb the jury's weighing of aggravating and mitigating circumstances.

Finally, we must determine whether defendant's sentence is disproportionate, considering both defendant and his crime. In determining proportionality, we consider "all cases which are roughly similar in facts to the instant case, although we are not constrained to

cite each and every case we have used for comparison." *State v. McNeill*, 360 N.C. 231, 254, 624 S.E.2d 329, 344 (citing *State v. Al-Bayyinah*, 359 N.C. 741, 761, 616 S.E.2d 500, 514 (2005), *cert. denied*, 547 U.S. 1076 (2006)), *cert. denied*, —— U.S. ——, 127 S. Ct. 396, 166 L. Ed. 2d 281 (2006). Likewise, "[a]lthough we 'compare this case with the cases in which we have found the death penalty to be proportionate. . . . we will not undertake to discuss or cite all of those cases each time we carry out that duty.' " *State v. Garcia*, 358 N.C. 382, 429, 597 S.E.2d 724, 756 (2004) (quoting *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254 (1994)), cert. denied, 543 U.S. 1156 (2005). "[O]nly in the most clear and extraordinary situations may we properly declare a sentence of death which has been recommended by the jury and ordered by the trial court to be disproportionate." *See State v. Chandler*, 342 N.C. 742, 764, 467 S.E.2d 636, 648, *cert. denied*, 519 U.S. 875 (1996). The determination of proportionality of an individual defendant's sentence is ultimately dependent upon the sound judgment and experience of the members of this Court. *See McNeill*, 360 N.C. at 253, 624 S.E.2d at 344 (citing *State v. Garcia*, 358 N.C. at 426, 597 S.E.2d at 754).

This Court has previously determined capital punishment was disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). The instant case is dissimilar to all of these cases. In only two of these cases did the jury find the murders to be especially heinous, atrocious, or cruel: *Stokes* and *Bondurant*.

In *Stokes*, the defendant was seventeen years old and the only one of four assailants to receive the death penalty. 319 N.C. at 3-4, 21, 352 S.E.2d at 654-55, 664. In *Bondurant*, the defendant showed immediate remorse for his actions and even directed the victim's transport to the hospital, hoping to see the victim live. 309 N.C. at 694, 309 S.E.2d at 182-83. In the instant case, defendant was the sole murderer of his neighbor. Defendant did not seek medical attention for his victim; instead, he left her bleeding to death on the floor of her own

home while he departed to withdraw money from her bank account by using her ATM card and the PIN number he had tortured out of her. Defendant's sentence is not disproportionate, considering defendant and his crime.

## CONCLUSION

[14] Defendant has assigned numerous other instances of error, but provided no argument or supporting authority for these assignments in his brief. Those assignments of error are considered abandoned and are therefore dismissed. *See* N.C. R. App. P. 28(b)(6); *State v. McNeill*, 360 N.C. at 241, 624 S.E.2d at 336. We conclude that defendant received a fair trial and sentencing proceeding, and we find no error in his convictions or his sentences. We additionally conclude that defendant's sentence of death is not disproportionate to the crime he committed.

NO ERROR. ˙

Chief Justice PARKER concurring in the result only.

Defendant argues that the trial court erred in failing to exclude for cause prospective juror Billy Goodson, a Lieutenant with the Carolina Beach Police Department, who expressed concern over his own ability to consider evidence in defense or in mitigation, specifically evidence that would support guilt phase defenses of diminished capacity attributable to intoxication and statutory and nonstatutory mitigating circumstances relating to defendant's mental state, intoxication, child abuse, and the effects of domestic violence. For the reasons stated herein, I concur in the result only.

When considering whether a defendant had the right to question jurors whether they would automatically impose a sentence of death upon conviction in a capital trial, the U.S. Supreme Court noted:

It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized."

*Morgan v. Illinois,* 504 U.S. 719, 735-36, 119 L. Ed. 2d 492, 507 (1992) (footnote omitted) (quoting *Turner v. Murray,* 476 U.S. 28, 36, 90 L. Ed. 2d 27, 36 (1986) (plurality) (alteration in original).

During *voir dire* in this case, prospective juror Goodson, a law enforcement officer with experience investigating murder cases, interrupted questioning by the defense to offer an observation that he thought would "shorten this process for you and the Court." He then stated:

> I'm going to have a great propensity to scrutinize the mitigating circumstances that [defense counsel] alluded to yesterday in his voir dire of some of the other counselors [sic]. And based on that, I will have a natural inclination to look at some of those mitigating circumstances in a little more detail than perhaps others may or may not. And I can say that unless I see a mitigating circumstance that is a non self-induced condition, then I'm not inclined to give a lot of weight to it.

> Without—there is no other persons here, so I'm going to say it, if it's not a mental condition, that is, it's not self-induced, I hope you know how hard it is to say, if it's not a capital offense punishment. And that's my interpretation of what mitigating means to me as an individual.

> . . . .

> And I'm saying that it's not an excuse, as some people think. It's an explanation of why things occurred. And because of the nature of the investigations that I have done over the past umpteen years, that an explanation in some cases are a logical mitigating circumstance.

> [DEFENSE]: Do you find mental illness to be one?

> [JUROR]: I do, yes, sir. I can say in my personal viewpoint that mental illness is a condition that takes out the rationalization that you and I grew up with, from right and wrong. Short of that, there is not a whole lot on that list that I would consider.

> . . . .

> Short of mental illness, medically defined attributed mental illness, that would rationally justify our actions, I don't personally see any other type of mitigating circumstances that can justify the taking of a life. And, again, as was alluded to in your presenta-

**STATE v. CUMMINGS**

[361 N.C. 438 (2007)]

tions yesterday, there may be some other issues that you're going to be broaching that . . . many cause for consideration of mitigation. Having investigated numerous cases of that, and listening to people everyday—

. . . .

Cases where that type of explanation as to why crimes were perpetrated.

[DEFENSE]: Mental illness?

[JUROR]: No.

[DEFENSE]: Another explanation you're not talking about?

[JUROR]: Domestic violence, drug use, broken homes . . . learned violence. I don't find those as acceptable mitigating circumstances for someone having committed a homicide.

[DEFENSE]: All right. Now, that's—I do thank you for telling me that. You prefaced that by saying, I think, that might expedite what we're doing here this morning. That is a view that developed over your years as a law enforcement officer?

[JUROR]: Yes, sir.

[DEFENSE]: And it involved the cases that you worked on and things of that nature?

[JUROR]: Yes, sir.

The prospective juror would later state:

I can follow the law, as I told the State, regardless of having the knowledge of the circumstances that's been [alluded] to by [the defense], I would follow the law down to the line. I can reach a conclusion as to what I think would be the appropriate punishment if, in fact, he was found guilty of it.

But as I pointed out to you earlier, counselor's explanations of as use of justification of why something occurred or didn't occur under mitigating circumstances, I'm going to take a crucial look at. And in my personal viewpoint, has nothing to do with law enforcement, I just think that it's going to be, short of mental illness, some major issues along those lines that I'm not going to put much credence to justifying or rationalizing acts that we take—that we have control over.

[DEFENSE]: Having that view of things, do you feel that that would in any way influence or have an impact on the way you would hear what we'll call the guilt phase?

. . . .

[JUROR]: I would say it will obviously have an [effect]. I will be as objective as I can to listen to the mitigating circumstances surrounding this particular case, but I think I'm going to have a very limited window in which things that I would consider that would negate the death penalty.

[DEFENSE]: Your window is limited to mental illness, isn't it?

[JUROR]: I'm saying that is one example. Yes, I'm sure there is some others out there that perhaps I haven't thought about. However, listening to what's been proffered by the defense, at this point, I'm saying mental defense, mental illness would be something along the lines. It's going to take to satisfy me that first degree—or that the death penalty is not warranted.

[DEFENSE]: In all the time that you sat here and listened to the examination of other jurors, would you say that that—of all the information you've heard is the most significant sticking point as to whether or not you feel you could be a fit juror in this case?

[JUROR]: Absolutely. Up until you brought this subject up yesterday, I was sitting in the middle of the fence, you know, either way I had no preponderance of decision or any opinion one way or the other, would have been a very fair—I think I would have been fair. But I'm just honest with you with regard to what I call explanations of why incidents occur.

[DEFENSE]: These [ ] thoughts didn't develop just over the last day or two. They've been thoughts that have gone through your mind over some time, haven't they?

[JUROR]: I've investigated too many cases for that not to have been an issue in my developments.

[DEFENSE]: And when you say it's an issue, you do in your way of thinking, equate some explanations, as just being, can we use the word cop-out, for criminal acts?

[JUROR]: It's an adequate term, yes, sir.

[DEFENSE]: And is it fair to say you really just don't think very much of that at all positive?

[JUROR]: No, sir. As I said before, we're all responsible for what we do or don't do, getting drunk, drunk driving is not a homicidal explanation of why we go out there and have wrecks and people die or the use of drugs or any of these others that I heard everyday.

[DEFENSE]: And as you've thought about it, you believe that that is an aspect of your value system based on your own personal values, your own professional experiences, that would color your understanding as you hear the evidence in this case?

[JUROR]: It has a potential to do that, yes, sir.

[DEFENSE]: And that gives you concern, too?

[JUROR]: Yes, it does.

[DEFENSE]: A significant concern?

[JUROR]: Now that I've heard the defense's line of approach to this trial, yes, sir.

. . . .

[DEFENSE]: Now, you may receive some legal instructions relating to certain matters pertaining to say whether or not someone had consumed alcoholic beverages and whether or not that would diminish their capacity. You've heard [the prosecutor] talk about felony murder, which you are aware of; armed robbery, which you're aware of; breaking and entering, you are aware of that?

[JUROR]: Yes, sir.

[DEFENSE]: Premeditation, deliberation, you're very familiar with those terms. And [diminished] capacity, that is a defense that could be involved in a case, you've heard of this before?

[JUROR]: Yes, sir.

[DEFENSE]: And when you've talked for the last number of minutes . . . about these matters relating to mitigation, it's things like that that you just kind of come to the end of your road on, isn't that it?

. . . .

That is an intellectual rub for you?

[JUROR]: Yes, sir. I think everybody has their limits of what tolerance for various things. That would be, to me, the end of that, I think.

[DEFENSE]: If the Judge were to say—give you an instruction relating to certain matters that would pertain to things short of your window, and I understand you, your window could be tainted, but the window you indicated of mental illness, if he were to give you instructions relating to something beyond that, do you feel that that is an instruction you would find difficult to follow?

. . . .

[JUROR]: If the Court instructs me to follow certain guidelines, I will follow them to the end.

. . . .

[DEFENSE]: Understanding that you would try, if you took an oath to be a juror in this case, to follow all the instructions the Court gave you. I'll ask you to think, do you believe it would be a difficult one for you to do if it related to something that went beyond the issue of mental illness?

[JUROR]: No, sir. If the Court directed me to consider it, then that's going to happen. To me, I don't find—to me it's black or white. If the Court says that we should consider that and that's within the realm of the thing that I have to do, then I'll do that.

[DEFENSE]: But let me ask you, before you get to the place that the Judge may give you that instruction, you'll be listening to evidence and information and things of that nature. . . .

. . . .

Do you feel it would be—we're not up to the place where the Judge is giving the instructions. That would come at the end of the trial, as you know. But I'm talking about during the course of the trial, as you're hearing information from witnesses and things of that nature, do you think that your point of view would make it more difficult for you to receive that information in a fair-minded way?

[JUROR]: I would say no, it would not impede me receiving it. I'm open to a myriad of explanations with possibilities of things

that evidence, whatever it might have been. I'm not a close-minded individual. But I would say that, obviously, if it wasn't something of a substantial nature, it wouldn't change my philosophy or my attitude.

Later counsel for the defense read the prospective juror the pattern jury instruction concerning the voluntary intoxication defense to first-degree murder:

[DEFENSE]: "You may find there is evidence which tends to show that the Defendant was intoxicated or drugged at the time of the acts alleged in this case. Generally, voluntary intoxication is not a legal excuse for crime. However, if you should find that the Defendant was intoxicated, was ever drugged, you should consider whether this condition affected his ability to formulate the specific intent which is required for a conviction of first-degree murder."

Now, up to that point, are you understanding what the instruction is asking you?

[JUROR]: Yes, sir.

[DEFENSE]: In order for you to find the Defendant guilty of first-degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual specific intent to kill, formed after premeditation and deliberation.

Now, this next line in the instructions goes to the mental state of the Defendant, "If, as a result of intoxication, a drugged condition, the Defendant did not have the specific intent to kill the deceased, formed after premeditation and deliberation, he is not guilty of first-degree murder."

Let me ask: Do you understand what the instruction is saying?

[JUROR]: I understand.

[DEFENSE]: Now, on the basis of your years in investigations and such, is it that issue that gives you some concern, the issue of someone being voluntarily intoxicated or the use of some drug?

[JUROR]: Yes.

[DEFENSE]: And that is a matter that you do not find to be an excuse for a crime?

[JUROR]: No.

[DEFENSE]: And it's not a matter that you find mitigating, is it?

[JUROR]: No, sir.

[DEFENSE]: And you have come to that belief after considerable thought, I would imagine. This is not a matter that's just popped into your mind. This is something that's been a part of your work for some years, hasn't it?

[JUROR]: Yes, sir.

[DEFENSE]: The many offenses that you may have seen [during your law enforcement experience], you've seen actions by people who have been either impaired or drugged, haven't you?

[JUROR]: Yes, sir.

. . . .

[DEFENSE]: And everything about that, you just find to be offensive, don't you? I mean—

[JUROR]: I won't say it's offensive. I just don't believe it is a justification or rationalization or an excuse, whatever label one wants to attach to it.

. . . .

[DEFENSE]: Lieutenant, do you feel that your views relating to self-imposed impairment or intoxication would it make it difficult for you to follow the law with respect to the instruction that's been read?

[JUROR]: I could follow it. Do you mean do I agree with it?

[DEFENSE]: Well, do you feel that your [dis]agreement with it that's carried with you into this courtroom, is one that would make it difficult for you to follow that instruction?

[JUROR]: I can follow the instruction. Like I said, I don't necessarily agree, but I would evaluate and make a decision based on what the Court tells me to do.

[DEFENSE]: There is some reluctance, though, on your part that is born of difficulty.

[JUROR]: Absolutely.

[DEFENSE]: And even though an instruction may be given, it would certainly be a part of your life experience that would be carried into the jury room as well; is that fair to say?

[JUROR]: Yes, sir.

Defendant challenged this prospective juror for cause. The trial court denied defendant's motion, stating:

The Court has had occasion to observe [the prospective juror] for some time. He's been examined by the Court, by counsel for the State and counsel for the Defendant. And there is just no doubt about it, he is a man of strong conviction and he is with [sic] viewed with strong beliefs, including matters in mitigation.

But the Court is, likewise, convinced that he will follow the law. And if his belief or beliefs differ from the law, he will yield and try to obey and follow the law as he is instructed to him [sic] by the Court.

In looking at his face, he's got a face that's been chiseled in stone and I imagine his convictions are just the same way. His convictions are strong. And if he sits there and tells us that he will yield a matter of personal preference or belief and follow the law, I think he will do so. The evidence demonstrates that he is a soldier. He is a patriot, a good man and good juror.

The Court is of the view[ ] that he should not be excused for cause and motion to challenge for cause is denied.

Defendant excepted to this ruling and then exercised a peremptory challenge as to the prospective juror. Defendant later renewed his challenge for cause as to the prospective juror, which was again denied. In denying the renewed challenge for cause, the trial court stated:

All right, the Court does, on the motion pursuant to 15(A)-1214(h) and (i), revisit the ruling [denying the challenge for cause of the prospective juror]. [He] is the gentleman identified by the Court as the soldier, patriot, good man, good juror, a man of strong convictions, views with strong beliefs, including the matters in mitigation. The Court concluded he would follow the law even if his beliefs differed. And looking back at his comments, I think any person could pull out any one comment by any

one juror to probably support a position either for or against the juror being discharged.

And so the Court, likewise, has had an occasion to review his examination by the Court by Counsel for the State and by Counsel for the Defendant and considered his examination in its totality and I do note that he did indicate that he could follow the law, even though he may disagree with it. He was being asked at that time about self-imposed alcoholism, which again is just one comment by the juror, but the total of his comments and the examination of this Court of his demeanor and his responses and his approach to his views convinces this Court that the ruling should stand. [The prospective juror] should not be excused for cause upon the renewed motion. The motion to remove him for cause is denied.

Defendant exhausted his peremptory challenges and asked to exercise an additional peremptory challenge as to an additional juror, who was then empaneled. The requirements of N.C.G.S. §§ 15A-1214(h) and (i) were thus satisfied, thereby preserving any error for review and establishing prejudice to the defendant in the event an abuse of discretion occurred.

This Court has said,

A juror who reveals that he is unable to accept a particular defense or penalty recognized by law is prejudiced to such an extent that he can no longer be considered competent. One "who is unwilling to accept as a defense, if proved, that which the law recognizes as such" should be removed from the jury when challenged for cause.

*State v. Leonard*, 296 N.C. 58, 62-63, 248 S.E.2d 853, 855-56 (1978) (citations omitted) (holding that denial of defendant's challenges for cause of three prospective jurors was error when prospective jurors indicated they would not be willing to return a verdict of not guilty by reason of insanity even if satisfied by evidence that the defendant was insane at the time of the crime); *see also State v. Cunningham*, 333 N.C. 744, 754-55, 429 S.E.2d 718, 723 (1993) (holding that denial of defendant's challenge for cause was error when transcript indicated prospective juror either did not understand or was reluctant to follow the principles of presumption of innocence); *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992) (holding that

denial of defendant's challenge for cause was error despite prospective juror's assertions that he could follow the law when prospective juror repeatedly stated that the defendant's failure to testify would "stick in the back of my mind").

"[E]xcusal of a prospective juror for cause is not mandatory when he or she is able to disregard any personal convictions, follow the laws of the state as provided by the trial court, and render a fair and impartial verdict based on the evidence." *State v. Morgan*, 359 N.C. 131, 148, 604 S.E.2d 886, 897 (2004) (citations omitted), *cert. denied*, 546 U.S. 830, 163 L. Ed. 2d 79 (2005). Although the challenged juror here asserted that he would be able to follow the law "to the end," "[t]he court is not bound by the answers of the juror on his *voir dire* when they are opposed to and inconsistent with the facts and circumstances disclosed by his examination." *State v. Lee*, 292 N.C. 617, 624-25, 234 S.E.2d 574, 579 (1977) (citations and quotation marks omitted); *see also Cunningham*, 333 N.C. at 754-55, 429 S.E.2d at 723 (finding ambiguity in the context of the entire *voir dire*, despite some responses regarding the presumption of innocence that were appropriate, sufficient to render prospective juror excludable for cause).

From the record of *voir dire* before this Court, I am of the opinion that this particular prospective juror's ability to consider impartially evidence relevant to both guilt phase defenses and various statutory and nonstatutory mitigating circumstances was questionable. I acknowledge that the prospective juror asserted his ability to follow the law and the trial court's instructions, and I am confident that he intended to do so. Nevertheless, in the context of the entire *voir dire*, his expressions of his views regarding "self-imposed" conditions raise serious concerns as to his ability to consider impartially evidence in defense and in mitigation. The prospective juror's statements suggest that he was perhaps the precise juror described in *Morgan v. Illinois*, the one who "by definition . . . cannot perform [his] duties in accordance with the law, [his] protestations to the contrary notwithstanding." 504 U.S. at 735, 119 L. Ed. 2d at 506.

By his comments concerning relevant mitigating evidence, this prospective juror essentially stated that he could not follow the law. In *State v. Jaynes* this Court said:

If a juror determines that a statutory mitigating circumstance exists, however, the juror must give that circumstance mitigating

STATE v. CUMMINGS

[361 N.C. 438 (2007)]

value. The General Assembly has determined as a matter of law that statutory mitigating circumstances have mitigating value. Therefore, jurors must give them some weight in mitigation. Nevertheless, the amount of weight any particular statutory mitigating circumstance is to be given is a decision entirely for the jury.

342 N.C. 249, 285, 464 S.E.2d 448, 470 (1995) (internal citations omitted), *cert. denied,* 518 U.S. 1024, 135 L. E. 2d 1080 (1996).

However, the trial court has broad discretion in overseeing *voir dire,* including whether to grant or deny a challenge for cause. *State v. Abraham,* 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994); *State v. Quick,* 329 N.C. 1, 17, 405 S.E.2d 179, 189 (1991). The standard of review is whether the trial court abused its discretion and whether this abuse of discretion prejudiced the defendant. *Abraham,* 338 N.C. at 343-44, 451 S.E.2d at 145-46. An abuse of discretion is established upon a showing that the trial court's actions were "manifestly unsupported by reason" and "so arbitrary that [they] could not have been the result of a reasoned decision." *State v. Williams,* 361 N.C. 78, 81, 637 S.E.2d 523, 525 (2006) (alteration in original) (citations and internal quotation marks omitted). *But see Hightower,* 331 N.C. at 641, 417 S.E.2d at 240 (stating that "in a case . . . in which a juror's answers show that he could not follow the law as given . . . by the judge in his instructions to the jury, it is error not to excuse such a juror").

Giving deference to the discretion of the trial judge who observed the prospective juror, heard the prospective juror's voice, and opined at length as to the juror's patriotism, chiseled looks, and firm beliefs, I concur in the result only.