STATE OF NORTH CAROLINA
v.
JERMAINE MARTEZ NASH
No. COA08-343
Court of Appeals of North Carolina.
Filed November 4, 2008
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General C. Norman Young, Jr., for the State.
Geoffrey W. Hosford for defendant-appellant.
BRYANT, Judge.
Defendant appeals from a judgment entered 14 December 2007 in accord with a jury verdict of guilty on the crime of second degree murder. The trial court sentenced defendant to 251 to 311 months in the custody of the North Carolina Department of Correction. For the reasons stated herein, we hold no error.
At trial, the evidence presented tended to show that on 15 November 2005 at approximately 2:00 a.m. defendant was standing on Sapona Road in Cumberland County when "a car came up with an Indian male driving and a White male in the car." The driver pointed a gun at defendant and instructed defendant to give him everything he had. Defendant ran and later testified that a couple of gun shots were fired at him, but he was not hit. At approximately 10:00 a.m. that same morning, defendant went to Tracy Johnson's house. Defendant recognized the White male in the car from a previous meeting at Johnson's house, and defendant went to Johnson's house to begin searching for him. Defendant described the assailant to Johnson who informed him that the man's name was Harold. Johnson said Harold did not live far away, and she would help defendant find him. On the way to finding Harold, defendant and Johnson were joined by Dennis Fort, and ultimately ran into Zander Hammonds.
Defendant informed Hammonds that he was looking for Harold. Hammonds called Harold and told him to meet defendant in front of Hammonds' residence. Defendant and Harold spoke for approximately five to seven minutes. There was no physical altercation, and Harold explained that with regard to their previous encounter, he did not know "that was going down." Defendant testified that he and Harold "came to an agreement, and it was over with."
There was conflicting evidence as to what happened next. Defendant testified that victim Shane Peoples appeared from a nearby trailer and walked up to defendant while he and Harold were talking. Defendant testified that Peoples was irate, accused defendant of robbing him, and spoke in a loud, menacing voice. Defendant also believed Peoples to be "high."
Defendant testified that Peoples pulled out a knife which he described as having a two to three inch blade. According to defendant, Johnson interceded and tried to calm Peoples. Defendant testified that Peoples pushed Johnson aside and twice swung his knife at defendant, striking defendant on the hand. Defendant testified that, fearing for his life, he took a .32 caliber handgun from his pants and fired twice; then defendant ran.
Hammonds testified that Peoples came out and first spoke to Hammonds and that he warned Peoples not to speak to defendant. Hammonds informed Peoples that defendant had accused Peoples of robbing defendant three days earlier and that defendant had a gun. According to Hammonds, Peoples stated that this was not the case but that defendant had robbed Peoples. Despite Hammond's warning, Peoples went to talk to defendant.
According to Hammonds, defendant and Peoples talked, then argued, before defendant pulled out a handgun and shot Peoples twice in the stomach. Hammonds testified that at the moment Peoples was shot, he had nothing in his hands and his hands were in the air. After the first two shots were fired, everyone ran. Hammonds heard a total of four shots but could not say who fired the last two shots.
Defendant testified that as he ran away, five or six shots were fired at him and one shot hit him in the buttocks. Defendant ran to a friend's house and called his cousin for a ride to the hospital.
At the hospital, defendant was interviewed by Detective Sergeant Kellie Shipman-Hart and Sergeant Mike Murphy with the Fayetteville Police Department. Defendant testified that initially, he gave the police officers a false story that he was onDeep Creek Road and was shot at by three black males driving in a four-door vehicle. Defendant did not mention Peoples.
Shortly after the shooting, Fayetteville Police Officer Paul Bemesderfer, was dispatched to the intersection of Hammond Street and Long Street near Sapona Road to investigate a shots-fired call. Officer Bemesderfer testified that a man waived him down, and informed Officer Bemesderfer that somebody had been shot in his front yard. Officer Bemesderfer then observed a man lying on his back behind some hedges. The man suffered from a possible bullet wound. His eyes were rolled back in his head, but he was still breathing. Officer Bemesderfer also noted that the man's pants were half way down his legs, his zipper had been undone, and his pockets turned out. Officer Bemesderfer later testified that the area was a moderate to high crime area with the typical report involving narcotics, prostitution, or shots fired. Furthermore, Officer Bemesderfer testified that in his experience, when a man on the street has narcotics on his person, that man generally tries to conceal those narcotics by carrying them "[i]n their private and scrotum." Medical personnel arrived to tend to Peoples within ten to fifteen minutes of Officer Bemesderfer's arrival and eventually took him away.
While Peoples was being tended to, other officers and detectives arrived, secured the scene, and searched the area for weapons and contraband. Officer Bemesderfer testified that two spent . 38 caliber shell casings were found on the street but no weapons or narcotics were found. While he canvassed the scene, Officer Bemesderfer was approached by only one person who said she saw the shooting. Her name was Akisha Cashwell.
Cashwell testified that she was visiting Hammonds the day of the shooting. While at Hammonds' residence, she observed Tracy Johnson, defendant, and a young boy named Dennis Fort walk up the street and ask to speak to Harold. Around that time, Peoples appeared. Cashwell did not recall who said what to whom but defendant and Peoples started to argue. Cashwell turned her attention to a friend that drove up in a car with her child. And, "then, that's when [she] heard the gunshots." Cashwell testified that she looked around to see Peoples fall over a bush. She pushed her friend and the baby into the car and ducked down. When she heard no more shots, Cashwell ran to a friend's house and dialed 9-1-1. Cashwell returned to Peoples's side and held his hand while talking to the 9-1-1 operator. According to Cashwell, a prostitute in the neighborhood pulled Peoples's pants down while she was looking through his pockets. Cashwell remained with Peoples until the police arrived.
Peoples was pronounced dead at Cape Valley Medical Center. Dr. John D. Butts, a forensic pathologist and Chief Medical Examiner for the State of North Carolina, testified that Peoples died as a result of two gunshot wounds.
On 24 April 2006, a grand jury indicted defendant on the charge of first degree murder. A trial was commenced in Cumberland County Superior Court, but on 20 August 2007 after a jury deliberated and returned to open court without reaching a unanimousverdict, the trial court withdrew a juror and declared a mistrial. A new trial was commenced during the 10 December 2007 session of Superior Court in which defendant was charged with second degree murder.
During the State's case-in-chief, Kendrick Malloy testified that he knew Peoples most of his life. Malloy also knew defendant from school and "[meeting] him on the streets." Malloy testified, over defendant's objection on 404(b) grounds, that on the evening of 29 September 2005, at approximately 6:15, he and Peoples were walking near Sapona Road when five or six gunshots were fired at them from a passing burgundy Century. Malloy testified that defendant was driving the car and shooting. No one was hit, and Malloy did not report the incident to police.
At the conclusion of the trial, the jury found defendant guilty of second degree murder. The trial court entered judgment consistent with the verdict and sentenced defendant to 251 to 341 months in the custody of the North Carolina Department of Correction. Defendant appeals.
On appeal, defendant raises the following four arguments: (I) The trial court committed reversible error when it admitted evidence of the alleged September 2005 shooting; (II) the trial court erred in denying the motions to dismiss the charge of second degree murder; (III) the trial court committed plain error in permitting the State to cross-examine defendant about priorarrests; and (IV) the trial court permitted the clerk to improperly poll the jurors.

I
First, defendant argues that the trial court committed reversible error when it admitted evidence of the alleged September 2005 shooting. Specifically, defendant argues that the evidence did not constitute proper 404(b) evidence. We disagree.
Under the North Carolina Rules of Evidence, Rule 404(b),
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.
N.C. Gen. Stat. § 8C-1, Rule 404(b) (2007). "Our Supreme Court has stated that the Rule 404(b) list of permissible purposes for admission of `other crimes' evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." State v. McCree, 160 N.C. App. 19, 27, 584 S.E.2d 348, 354 (2003) (citation omitted). "Rule 404(b) is [a rule] of inclusion, subject to but one exception requiring [the] exclusion [of an offer of proof] if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." See State v. Stevenson, 169 N.C. App. 797, 800, 611 S.E.2d 206, 209 (2005) (citation, quotations, and emphasis omitted). The use of evidence under Rule 404(b) is guided by two constraints: similarity and temporal proximity.
When the features of the earlier act are dissimilar from those of the offense with which the defendant is currently charged, such evidence lacks probative value. When otherwise similar offenses are distanced by significant stretches of time, commonalities become less striking, and the probative value of the analogy attaches less to the acts than to the character of the actor.
State v. Bidgood, 144 N.C. App. 267, 271-72, 550 S.E.2d 198, 201 (2001) (citation and quotations omitted).
Here, defendant was charged with second degree murder. During the State's case-in-chief, Kendrick Malloy testified to a previous altercation between defendant and Peoples. Malloy testified that on the evening of 29 September 2005 at approximately 6:15, he and Peoples were walking near Sapona Road when five or six gunshots were fired at them from a passing burgundy Century. Malloy testified that defendant was driving the car and shooting.
Zander Hammonds, Jr. testified that he observed the altercation between defendant and Peoples that occurred on 15 November 2005. According to Hammonds, defendant and Peoples met near his residence, started talking, and eventually argued. Defendant pulled out a handgun and shot Peoples twice in the stomach. Hammonds testified that at the moment he was shot, Peoples had nothing in his hands and his hands were in the air.
We hold that the testimony of Malloy regarding the shooting on 29 September 2005 is sufficiently similar and close in temporal proximity to the shooting on 15 November 2005 to be probative on the issue of defendant's motive to commit the crime charged. The admission of Malloy's testimony did not run afoul of Rule 404(b). See Stevenson, 169 N.C. App. at 800, 611 S.E.2d at 209. Accordingly, defendant's assignment of error is overruled.

II
Next, defendant argues that the trial court erred in denying defendant's motion to dismiss the charge of second degree murder. Defendant argues that the State failed to prove beyond a reasonable doubt that defendant failed to act in self-defense and that at most, the evidence supports a charge of voluntary manslaughter. We disagree.
"Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation." State v. Downey, 253 N.C. 348, 353, 117 S.E.2d 39, 43 (1960). "Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation." State v. McCollum, 157 N.C. App. 408, 412, 579 S.E.2d 467, 470 (2003) (citation omitted) (original emphasis). When a jury convicts a defendant of second-degree murder and rejects a charge of voluntary manslaughter, it necessarily finds that the defendant acted with malice. Id. at 414, 579 S.E.2d at 471. A finding of malice precludes a finding of either voluntary manslaughter or involuntary manslaughter. Id.
What constitutes malice varies depending upon the facts of each case. Our courts have specifically recognized three kinds of malice:
One connotes a positive concept of express hatred, ill-will or spite, sometimes called actual, express or particular malice. Another kind of malice arises when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief. Both these kinds of malice would support a conviction of murder in the second degree. There is, however, a third kind of malice which is defined as nothing more than that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.
State v. Grice, 131 N.C. App. 48, 53, 505 S.E.2d 166, 169 (1998). Our Supreme Court has held that "[t]he element of malice for second-degree murder . . . may be established by evidence that a person intentionally inflicted a wound that results in death." State v. Coble, 351 N.C. 448, 451, 527 S.E.2d 45, 47 (2000) (citation omitted).
Here, Zander Hammonds, Jr. testified that defendant and Peoples started talking and eventually argued. According to Hammonds, defendant then pulled out a handgun and shot Peoples twice in the stomach. Hammonds testified that at the moment he was shot, Peoples had nothing in his hands and his hands were in the air. Dr. John D. Butts, a forensic pathologist and Chief Medical Examiner for the State of North Carolina, testified that Peoples died as a result of two gunshot wounds. We hold such evidence is sufficient for a jury to conclude that defendant unlawfully killed Peoples with malice and that defendant did not act in self-defense. Accordingly, defendant's assignment of error is overruled.

III
Defendant next argues that the trial court committed plain error in permitting the State to cross-examine defendant about prior arrests and in permitting the State to express an opinion on defendant's veracity in front of the jury. We disagree.
[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.
State v. Cummings, 361 N.C. 438, 470, 648 S.E.2d 788, 807 (2007) (citation omitted).
Under the North Carolina Rules of Evidence, Rule 608(b), "[s]pecific instances of the conduct of a witness . . . may . . . in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness . . . ." N.C. R. Evid. 608(b) (2007).
In State v. Braxton, 352 N.C. 158, 531 S.E.2d 428 (2000), the defendant testified on direct examination about living conditions he endured in prison while in lockup and while on maximum security. Id. at 196, 531 S.E.2d at 450. On cross-examination, the State inquired into prison infractions the defendant committed prior tobeing placed in lockup. Id. at 195, 531 S.E.2d at 450. The defendant argued on appeal that the State's cross-examination exceeded the scope of Rule 608(b) because the "prison infractions [did] not inherently involve dishonesty and that nothing in the context of the challenged questions suggested that defendant's prison infractions were probative of his truthfulness or untruthfulness." Id. at 195-96, 531 S.E.2d at 450.
The Braxton Court stated that
Rule 608(b) of the North Carolina Rules of Evidence governs the admissibility of specific acts of misconduct where (i) the purpose of the inquiry is to show conduct indicative of the actor's character for truthfulness or untruthfulness; (ii) the conduct in question is in fact probative of truthfulness or untruthfulness; (iii) the conduct in question is not too remote in time; (iv) the conduct did not result in a conviction; and (v) the inquiry takes place during cross-examination.
Id. at 195, 531 S.E.2d at 450. The Court reasoned that the State's cross-examination of the defendant revealed that the defendant was placed in lockup as a form of punishment rather than mistreatment. Id. at 196, 531 S.E.2d at 450. The Court's conclusion was that the purpose of cross-examination was to show the defendant's character for untruthfulness and as such the cross-examination did not violate Rule 608(b). Id.
Here, defendant testified on direct examination that "[a]ctually, I have never been charged with shooting at anybody or possessing a firearm; or, anything violent, dealing with a weapon, I haven't been charged and convicted with any  anything to that nature." On cross-examination, the State conducted the following inquiry:
State: Now, you told the jury . . . that you had not been charged with any violent crime and then you said you had not been charged and convicted of any violent crime, correct?
. . .
Well, that wasn't entirely correct, was it, sir?
Defendant: Okay, Yeah, I might have made  I might have misstated that.
. . .
State: So, there were two instances previously when you said you had not been charged with a violent crime when in fact you had?
. . .
Now, one of those involved an assault on a female . . . where you were also charged at the same time with assault by pointing a gun, correct?
Defendant: Yes.
State: You pled guilty to the assault on a female and the other charge was dismissed?
Defendant: Yes, it was.
State: So, you weren't convicted of it?
Defendant: No.
State: But you were charged with it?
Defendant: Yeah, I was charged with it.
. . .
State: Now, when you told [the jury] that you had not been charged with a violent felony, you were also charged in that instance with an assault with a deadly weapon; that being, a gun, with intent to injure or kill another person, correct.
Defendant: Correct.
State: Now, that charge was in fact dismissed when you pled guilty to the other charge . . . .
Defendant: Yeah . . . .
State: But you were charged with it, contrary to what you told the jury?
Defendant: Yes. I was charged with it. It was dismissed though, yes.
We hold that the purpose of the cross-examination was to show the defendant's character for untruthfulness and as such the evidence elicited during cross-examination did not violate Rule 608(b).
Defendant further argues that the trial court erred in permitting the State to express an opinion on defendant's veracity in front of the jury.
It is fair to say that improper suggestions, insinuations and assertions of personal knowledge by the prosecuting attorney ordinarily carry much weight against the accused when they should properly carry none. Consequently, the prosecutor may not determine matters of credibility and announce the result in open court  that is the jury's prerogative.
State v. Locklear, 294 N.C. 210, 218, 241 S.E.2d 65, 70 (1978). Here, the State cross-examined defendant regarding defendant's initial interview with police while defendant received medical treatment for the gunshot wound to his buttocks.
State: He was there talking to you as a victim of a gunshot wound, and you wouldn't tell him what happened 
Defendant: He was treating me like a suspect. I didn't  I really didn't want  feeling what he was talking about. I really didn't want to talk to him.
State: And was he treating you like a suspect, sir, because he was asking you to take a gunshot residue kit?
Defendant: No. He treated me like a suspect because I  I gave him a story. I told him I was shot. He knew I was shot. I was bleeding. I was going to get x-ray'd. He was following me to the x-ray room. He was still pestering me about what happened, what happened. You know, I tell him what happened, and they took me to the x-ray room. I come out 30, 35 to 40 minutes later, and he's still asking me what happened, what happened.
State: So, are you telling the jury that he was treating you like he didn't believe you?
Defendant: Yes, he was.
State: Well, he had good cause not to believe you because you were lying to him, weren't you? You didn't tell him the truth then, did you?
Defendant: He didn't know I was lying.
State: But you knew you were lying, didn't you?
Defendant: Yes, I did, but you said I was the victim 
We hold that this exchange was proper cross-examination and does not amount to improper suggestions, insinuations, or assertions of personal knowledge by the prosecuting attorney. Accordingly, defendant's assignments of error are overruled.

IV
Last, defendant argues that the trial court erred in permitting the clerk to improperly poll the jurors. Specifically, defendant argues that the clerk failed to separately inquire whether the juror assented to the verdicts both in the jury room and the courtroom. We disagree.
Under North Carolina General Statute section 15A-1238,
Upon the motion of any party made after a verdict has been returned and before the jury has dispersed, the jury must be polled. The judge may also upon his own motion require the polling of the jury. The poll may be conducted by the judge or by the clerk by asking each juror individually whether the verdict announced is his verdict. If upon the poll there is not unanimous concurrence, the jury must be directed to retire for further deliberations.
N.C. Gen. Stat. § 15A-1238 (2007).
In State v. Ramseur, 338 N.C. 502, 450 S.E.2d 467 (1994), the defendant requested that the jury be polled after it returned a verdict of guilty.
THE COURT: You want the jury polled?
[defense counsel]: Thank you, Your Honor.
BY THE COURT:
Q: Mr. Foreperson, would you please stand up again, please.
[Mr. Foreperson], you have returned a verdict in open court that the jury unanimously find[s] the defendant guilty of first degree murder; guilty of assault with a deadly weapon with intent to kill inflicting serious injury upon [the victim]; guilty of assault with a deadly weapon with intent to kill inflicting serious injury upon [the victim]; and guilty of possession of a firearm by a felon. Was that your verdict?
A: Yes, it was.
Q: Is that still your verdict?
A: Yes.
Q: Do you still assent to that verdict, sir?
A: Yes, sir.
The transcript reveals that the trial judge proceeded to question each of the remaining jurors in a similar fashion and that each of the jurors unequivocally answered these questions in the affirmative.
Id. at 506, 450 S.E.2d at 470. The Ramseur Court held the polling of the jury yielded no error. Id. at 507, 450 S.E.2d at 470.
Here, the clerk polled the jury as follows:
Defendant: Just like to poll the jury, Your Honor.
The Court: Okay. Madame Clerk, would you please poll the jury?
Madam Clerk: Starting with the foreman, can you please stand, . . . .
[Mr. Foreman stood.]
Madam Clerk: The jury has returned, as its verdict, that the defendant, Jermaine Nash, is guilty of second-degree murder. Is this your verdict?
Juror # 7: Yes.
Madam Clerk: Do you still assent thereto?
Juror # 7: Yes.
Madam Clerk: You may be seated.
The transcript reflects that the clerk questioned the remaining eleven jurors similarly and that each juror responded to each question in the affirmative. As in Ramseur, we hold the jury poll yielded no error. Accordingly, defendant's assignment of error is overruled.
No error.
Judges WYNN and ARROWOOD concur.
Report per Rule 30(e).